IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STEPHEN SLEVIN,

Plaintiff,

vs. No.1:08-CV-01185

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DONA ANA;
THE DONA ANA COUNTY DETENTION CENTER,
CHRISTOPHER BARELA,
and DANIEL ZEMEK,

Defendants.

---

PARTIAL TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

---

January 19, 2012
1:21 p.m.)

HEARD BEFORE: HONORABLE MARTHA VAZQUEZ
United States District Judge
Santa Fe, New Mexico

A P P E A R A N C E S

For the Plaintiff: Matthew Coyte, Esq.
Jack Bennett Jacks, Esq.

For the Defendant: John W. Caldwell, Esq.

INDEX

| | Page |
|---|---|
| Reporter's Certificate | 25 |

THE COURT: What is it?

MR. COYTE: Before the next witness testifies, an issue has cropped up and we feel it's appropriate to bring it to the Court's attention. There's the person who wrote letters in this case from the Protection and Advocacy group, she's next to testify.

It's my understanding that the defendants intend to introduce evidence of subsequent remedial measures introduced into the jail after the lawsuit was filed by the Protection and Advocacy group. It's my understanding the lawsuit was filed in the end of 2007, so it's after Mr. Slevin's left the facility.

THE COURT: Please be seated.

MR. COYTE: And the evidence that they may wish to introduce will be how well the jail has done since the lawsuit, and how -- what the terms of the settlement agreement in that lawsuit were, in terms of what conditions they have to maintain, and the monitoring of that. And this all could potentially come from this witness.

I was not expecting to introduce any of that testimony, as remedial measures are not something I intended to deal with. In fact, I think they're prohibited from introducing remedial measures. So I was

totally unaware that defendants intended to do it themselves.

So I would object to that testimony. I believe it's irrelevant. I think it postdates his stay, and it's done within the confines of a forced order of a settlement agreement in a lawsuit. To have the jury be made aware of terms of an additional lawsuit that took place after Mr. Slevin left would only confuse issues and be more prejudicial than probative, and the 403 analysis as well.

So I would like the Court to be aware of that, and I would request that such testimony not be allowed.

THE COURT: Mr. Caldwell?

MR. CALDWELL: Your Honor, actually, the subsequent remedial measures that we may --

THE COURT: Do you mind approaching the podium so I could hear you better, please?

MR. CALDWELL: Your Honor, the subsequent remedial measures that we may solicit from Miss Koenigsberg or other witnesses actually started in the year 2006, shortly after Protection and Advocacy started writing us the letters. They -- some of them did occur during Mr. Slevin's stay. Again, it goes to the issues of deliberate indifference and to punitive damages.

407 is inapplicable if the rule is read. It can't be introduced to show liability, that's not the reason the defendant would introduce subsequent remedial measures. There is no prohibition that would apply to this evidence under Rule 407. The philosophy of 407 is to avoid discouraging defendants from taking remedial measures to correct a dangerous situation. And that just doesn't apply here.

Again, plaintiffs have alleged deliberate indifference. They have alleged that the defendants acted in bad faith. And this evidence goes to those issues.

THE COURT: What evidence, precisely, is it?

MR. CALDWELL: The evidence that the county increased the wages without talking about the collective bargaining agreement, increased the wages of detention officers, the people in the medical unit; the intense recruiting efforts; the realization that we could not recruit enough doctors or people to provide the care in the facility; and the issuance of a request for proposals, which was all issued before Mr. Slevin left.

And it is in response to Protection and Advocacy's and the American Civil Liberties Union letters, which he's introduced. They're part of the exhibits and will be part of Mrs. Koenigsberg's

testimony.

THE COURT: And she is who?

MR. CALDWELL: She -- I'm not sure what her title is.

MR. COYTE: A lawyer with the Protection and Advocacy group.

MR. CALDWELL: It's actually Disability Rights of New Mexico now, but they were Protection and Advocacy when they wrote these letters back in 2006.

THE COURT: All right. So, was this as a result of just a letter, or was it as a result of actual litigation, or what?

MR. CALDWELL: Well, none of the steps that I've described to the Court up to this point in time were a result of the settlement agreement. The increase in wages, the increase in recruiting effort, and the request for proposals all occurred before the lawsuit was filed. In fact, I believe the RFP was actually awarded before the lawsuit was filed. I can't remember exactly the day that the RFP was awarded, sometime in December -- or actually September of 2007. And the contract with the present health services was implemented in February or late January of 2008.

But all the actions taken by the county to remedy the situation in the jail occurred prior to the

filing of the lawsuit in Bravo versus Dona Ana County. The implementation of some of the things that occurred with PHS occurred after Mr. Slevin left. But it shows again a continuous effort by the county to resolve the issues raised by Protection and Advocacy, and it's in rebuttal to that.

THE COURT: And then what happens after this lawsuit? Or what -- I don't know anything about this, since all of you failed to file any motions about any of this. So then what is this lawsuit? What happened after this lawsuit?

MR. CALDWELL: The lawsuit was -- there was a settlement agreement. And the jail has been monitored for two years by an agreed monitor, selected by the two parties.

But again, prior to what we would introduce is, the county has gone far beyond the agreement that it entered into in that litigation. And this demonstrates, again, the effort on the county to provide adequate medical and mental health care to its detainees.

THE COURT: So then the evidence is, that is being proffered by the defense, is to include the efforts that you've described, but also evidence of the settlement, and also efforts that were made after the settlement?

MR. CALDWELL: Yes, Your Honor.

THE COURT: Is the settlement an exhibit here, too?

MR. CALDWELL: No, Your Honor. But Miss Koenigsberg and Mr. Barela both have knowledge of the settlement agreement terms, and the implementation of those terms, and what has gone beyond the terms of that settlement agreement.

THE COURT: Okay. So, is the jury going to hear about this lawsuit, the reason for this lawsuit?

MR. CALDWELL: I would assume that Mr. Coyte will solicit that from Miss Koenigsberg on his direct examination.

MR. COYTE: If I may address?

THE COURT: Yes.

MR. COYTE: The plaintiff intends simply to use Miss Koenigsberg to verify the letters that have already been before the Court in the exhibit notebook, that she wrote them, placed them on notice of their indifference, and what the response was at that time to her visit to the jail in 2005 and '06.

THE COURT: So, when did they file the lawsuit?

MR. COYTE: After Mr. Slevin left, after -- it's my understanding, though I'm not party to that lawsuit, and I wasn't involved in it in any sense or

shape or form, it's my understanding, however, and talked to Nancy a few moments ago, that after Mr. Slevin left in 2007, at the end of the year, they filed a lawsuit. I am aware that that lawsuit exists because I have depositions from it.

But at some point, they settled. And there's a settlement agreement that is confidential, except for the people -- Mr. Barela and Miss Koenigsberg would know about it. So I think that the evidence of what Mrs. Koenigsberg was doing in 2005 and '06, and the response to her when she says, she's telling them they're indifferent, what do they do about it? That is what is pertinent to this case.

What is not pertinent to this case is what they do later on. And to suggest that, because of a lawsuit and a settlement in a lawsuit, or the actual litigation itself, you force a defendant to behave himself, the fact that that in some way relates to deliberate indifference seems to me to be off base. If you're forced to do something, and then you do it, then you're -- then the relevance to deliberate indifference or punitive damages is not there.

So from what Mr. Caldwell is saying, however, is, We did even more than that. But still it's after he's left.

THE COURT: You know, I'm amazed you all didn't file any briefs on this. This is an obvious issue. And I told you I wasn't going to take up these things during jury time. I told you that at our pretrial conference. And this is a pretty important issue to your case that you must have considered, and I got nothing from the defense in this case. Nothing.

MR. CALDWELL: Actually, we agreed on all the exhibits prior to trial, Your Honor. And so we agreed to only submit one copy.

But Mr. Coyte has been provided copies of the deposition from that litigation. He actually, in examining Mr. Barela, showed the jury and Mr. Barela a copy of his -- portions of that deposition in the Bravo matter. And under New Mexico law, a settlement agreement with a public entity is probably never confidential and so there is no 408 protection, there is no contractual obligation for it to be confidential.

For him to say he's surprised we intend to solicit this information -- he and I have had a number of conversations, again, about Miss Koenigsberg testifying. And he's the one who didn't file a motion in limine to preclude that testimony.

THE COURT: All right. I'm not going to decide this issue right now. So I need more information about

this issue. So you can bring in another witness, but it's jury time right now, and I told you we weren't going to discuss these matters during jury time.

MR. COYTE: Okay, Your Honor. We appreciate that. We have a witness available.

THE COURT: All right. Please bring in the jury and have your next witness in the jury box, please.

(Jury enters the courtroom at 1:33 p.m.)

**********************************************

(Jury not present, 3:52 p.m.)

THE COURT: Please be seated. Counsel, if you need more time on this, I can also hear from you at 8:00 tomorrow morning. I only have about ten minutes before my meeting starts, but I thought we could at least take this issue up now, in the event we don't need that much time and I could make a ruling on it.

So, I just don't -- did not have enough factual development or enough information in order to rule on the objections. So, who wants to go first?

MR. COYTE: I apologize, Your Honor.

THE COURT: Joey, did all the jurors leave? Okay, thank you.

MR. CALDWELL: Your Honor, we're talking about the defendant's desire to introduce evidence of remedial measures.

THE COURT: Okay. And is that what the evidence is, is basically that's it, remedial measures that the county introduced in the jail facility?

MR. CALDWELL: It's improvements that were being done during the same period of time that Protection and Advocacy was writing the county about the conditions in the jail. And so they're not technically subsequent remedial measures, because some of them were ongoing as Mr. Slevin was still -- or detained in the facility. They began in probably January of 2006, he didn't leave until 2007.

We intend, or would like to go beyond that period of time because there are also -- there's a continuum of mitigation of the issues in the jail, and it continues from January of 2006 through 2009. And the plaintiff has implied --

THE COURT: Let me just get the time frame. They start when and go to when?

MR. CALDWELL: January, 2006.

THE COURT: That was the first one?

MR. CALDWELL: Yes.

THE COURT: And they go to --

MR. CALDWELL: They actually continue through today.

THE COURT: Okay. But the evidence that you're

trying to introduce will go to today, or through 2009?

MR. CALDWELL: Well, we would ask that it go through today. But, I mean, Miss Koenigsberg is aware of all the changes within the jail through this past week, and they are still ongoing.

And it's just in response -- partially in response to what they wrote in the letters that Mr. Coyte has introduced, but it's also part of the county's effort to mitigate conditions that it recognized in its own facility. It goes to two issues, or to two of the plaintiff's claims. Primarily goes to the issue of punitive damages and, secondly, it goes to the issue of deliberate indifference.

THE COURT: Okay. Is there anything else you can tell me about this? Because since this issue was not briefed, I don't have much time to review it. And if you can get me any case law on this, this evening, I would very much appreciate it.

MR. CALDWELL: I apologize to the Court. I didn't anticipate that 407 would be an objection, or that 408, because we discussed that.

THE COURT: Well, whatever the objection is, I mean, I sure would have appreciated some briefing on this issue. But whatever you can get me this evening would be great. Anything else you can tell me about this

evidence, how it's relevant, how it's admissible, would be great.

And what else? Anything else you can tell me about the evidence?

MR. CALDWELL: Well, if the Court would prefer, I'll put it in writing and present a motion in limine --

THE COURT: Well, I need to brief it tonight. So, anything else you can tell me about it?

MR. CALDWELL: Are you asking for the facts, Your Honor? That in January 2006, the county increased salaries, trying to attract officers and more mental health providers. It carries on into contracting it out. I believe I've already said that they increased the salaries in an effort to recruit. They retained a temporary employment agency to try to recruit mental health care employees, plus medical employees.

And as those things didn't work, the county eventually progressed, doing request for proposals, that was issued in 2007, probably around the time that Mr. Slevin was leaving, and was entered into in December of 2007, and implemented in 2008.

It responds to the allegation that the county was indifferent to the requests made by P and A, or that the county was aware of conditions and did nothing. Because that's what plaintiff has been arguing, based

upon those letters. So it's that continuum of acts by the county. And the defendants won't concede they were just in response to Protection and Advocacy; there were things the county was doing on its own to mitigate.

The Bravo case was filed in December of 2008 in state court. It was removed by another defendant to federal court, and that was based upon failure to provide mental health care. It was brought by 13 named plaintiffs.

THE COURT: And is that going to be evidence in this case?

MR. CALDWELL: Well, that's the lawsuit that Miss Koenigsberg's group brought against the county.

THE COURT: That doesn't answer my question. Is that going to be evidence in this case?

MR. CALDWELL: Yes, we do -- we intend to talk about it, yes. Because everything that's been done in that case is an improvement in the provision of medical care and mental health care in the jail.

THE COURT: And when was that case brought?

MR. CALDWELL: Filed in December of 2007.

THE COURT: Okay. And so certain actions were taken as a result of that case, which was not brought until December, 2007?

MR. CALDWELL: Well, actually, many of the

things the county has chosen to do that are not included in the settlement agreement are again part of that continuum of the county striving to bring its jails -- the jail's medical care and mental health care up to what we believe is constitutionally required, and what we think is appropriate for mental health detainees.

THE COURT: Okay. But before that lawsuit was brought, December, 2007, that organization was this same organization that was writing you letters?

MR. CALDWELL: Correct.

THE COURT: The letters that have been discussed in this case?

MR. CALDWELL: Yes, Your Honor.

THE COURT: Which prompted some of your actions?

MR. CALDWELL: Yes. Yes, Your Honor.

THE COURT: Okay. Go ahead.

MR. CALDWELL: And that's the information that we would like to present, to argue, or as our defense against punitive damages and deliberate indifference.

THE COURT: All right. Now, who are the witnesses that are going to be introducing this evidence?

MR. CALDWELL: Miss Koenigsberg, who is a witness named by the plaintiff. And Mr. Barela can also respond, can testify to this.

THE COURT: Okay. Is there anything else you want to tell me in support of the introduction of this evidence?

MR. CALDWELL: No, other than we believe it's relevant to the issue of punitive damages and deliberate indifference.

THE COURT: I'm sorry. I can't hear you.

MR. CALDWELL: No, just that it's relevant to the issue of punitive damages and deliberate indifference.

THE COURT: All right. Anything else as to admissibility, or how it comes in that you have at this time?

MR. CALDWELL: No, Your Honor.

THE COURT: So you'll brief that and have that to me tomorrow by 8:00?

MR. CALDWELL: Yes, Your Honor.

THE COURT: All right. Thank you.

What about you, Mr. Coyte?

MR. COYTE: The evidence from the witness, Miss Koenigsberg, we were anticipating providing, it was simply, You wrote these letters, you put them on notice there were problems, and some of the things that we've talked about in the case about the kind of problems they were putting them on notice for.

That is the testimony we anticipate securing from Miss Koenigsberg. It's related to 2006 only, and 2005, the contents of the letters that we are referring to. And it should take 20 minutes, 15 minutes.

We are objecting to the broadening of the fact. That we've brought this witness to talk about the warnings, essentially, they were giving the jail at that time.

THE COURT: I'm sorry, you're objecting to --

MR. COYTE: We're objecting to expanding that testimony further, expanding it to a lawsuit filed after my client left, being compelled to make changes in response to a lawsuit, a settlement agreement that goes until today, even, where they're being forced to comply with conditions of their settlement, all of which has no relevance to deliberate indifference or punitive damages. Being forced to do something as a result of a lawsuit doesn't defend yourself from deliberate indifference.

THE COURT: Did you know that they were intending to introduce evidence with regard to the changes that they have made in response to the letters that you've been talking about in this lawsuit?

MR. COYTE: I did not know, and nor did I -- I did not suspect nor think the legal basis existed to introduce the contents of a lawsuit after my client had

left. I expected them to fight the idea that they told Miss Koenigsberg that they were doing well at what they were doing, or they were not doing well. I expected them to fight Mrs. Koenigsberg's description of their action in 2006 as deliberately indifferent. So I expected them to fight that what they had in 2006 was deliberately indifferent, and welcomed to take that fight on from the evidence that has been presented.

I did not expect that after my client's left, and it never crossed my mind that after my client has left, they would be introducing how the jail is doing now.

THE COURT: But you were aware, were you not, that they made changes while your client was still in custody, pursuant to the letters that were being written by this organization?

MR. COYTE: My -- the changes they made, if you look at the letters, I disagree that any changes were made of any significance. The letters talked about a nail clipper being introduced into a pod or provided to the inmates. The letters talked about denying the allegations that were contained in Miss Koenigsberg's letter.

THE COURT: I don't know what changes were made. Obviously, I'm the last to know what the facts are

in this case. I am learning about them as the evidence is introduced. But Mr. Caldwell has indicated that the evidence he seeks to introduce is evidence of the nature of changes that were made by the defense in response to these letters.

MR. COYTE: Okay. And my understanding of what Mr. Caldwell just said was he was trying to introduce testimony of attempting to increase pay, or increases of pay and attempts to increase staffing.

THE COURT: Right.

MR. COYTE: Which I don't think affects the core of the case of deliberate indifference to medical care.

THE COURT: That's a question for the jury, is it not?

MR. COYTE: Yes. It is.

THE COURT: Okay.

MR. COYTE: So, what I'm saying is, the fight on the evidence concerning 2006 and the letters, and the points that the letters brought up would be fair to introduce. The fact that they, at some point later, increased pay or, after my client leaves, sent a request for an RFP or -- I'm not sure the date of that, or respond more affirmatively to Miss Koenigsberg's letters after they file a lawsuit, I don't think that is

necessary. So, there would be a real time break here, Your Honor.

THE COURT: Okay. I'm not quite sure how much of all that evidence should be admissible, but you should have filed a motion in limine on this issue. That's what motions in limine are for, is so we can deal with stuff prior to. Or you should have filed a motion in limine out of the abundance of caution.

So that we're not sitting here with me anticipating what on earth the evidence might be and not knowing precisely what the law is. So that we're not in the middle of this trial, with jurors waiting and my being late to a meeting. I don't like to make decisions that are so critical to people's cases without having enough factual development, and certainly no case law.

So, I want this issue researched by you. And yet I need you to work on jury instructions with my law clerk this evening, too. So, it seems to me that on an issue of punitive damages, deliberate indifference, that if, on the one hand, we are attacking the defendants for being aware of obviously terrible conditions, that if they are attempting to ameliorate them, then efforts to ameliorate them are relevant.

I will research this, too, tonight. But it seems to me that that is relevant.

Now, it's also relevant whether they are attempting to ameliorate them because they are aware of Mr. Slevin's condition or because they have this organization breathing down their necks. Whatever the reason is, if they are in fact attempting to ameliorate a terrible situation, then that is relevant for purposes of punitive damages.

You have the right to question motives, as you have. But they have the right to introduce evidence if in fact they are doing something about a terrible situation.

Now, what I don't know at this point is what the time frame is. I don't know whether they can introduce evidence of what they're doing today. I don't know if they have the right to introduce evidence after Mr. Slevin left. I don't know. I need to research that. You need to research that.

And I don't know how far the evidence becomes relevant. Is it just -- my guess right now, without doing research, is that they can introduce evidence as to those matters that pertain only to this lawsuit, the mental health issues, Fox 2 matters. But I need to research this. I mean, that's an important evidentiary ruling that needs to be made.

So, right now, that would be my ruling if I had

to make it right now and we still had the jury in here. But I don't like to make rulings without looking into matters a little bit more. So, the time frame, I'm not sure about, and I'm not sure about the scope of the measures that they made. Do they only deal with those improvements that dealt with Fox 2 only? Or can they introduce matters that go beyond Fox 2 issues?

So I'd like you to look into those matters and be prepared to address them tomorrow morning at 8:00 a.m. Okay?

MR. COYTE: Okay, Your Honor.

MR. CALDWELL: Yes, Your Honor. Do you want us to simply present our research at 8:00 a.m., or do you want us to file it electronically?

THE COURT: You know, if you can file it electronically, it gives me more time to read it in the morning, that would be great. But let's deal with it at 8:00 a.m. Okay? I'd appreciate it, if you have time. I know I'm putting a lot on you this evening, but I'd prefer to have something that I can review before we get a chance to talk about it. That would be great. All right?

And I understand we're a little bit behind on our schedule, right? We have tomorrow and we have Monday. And how many more witnesses do we have?

MR. COYTE: Plaintiff will be calling Dr. Grassian tomorrow, one witness. Dr. Cruz. Four or five witnesses tomorrow, Your Honor. Five witnesses.

MR. CALDWELL: Could the plaintiff identify who those witnesses will be?

THE COURT: Could you please identify those?

MR. COYTE: We're going to have Dr. Grassian. We're going to have Jennifer Fry. We will have Dr. Cruz. We will have a Kim Travers and a Rick Stevens.

THE COURT: I'm sorry. Rick who?

MR. COYTE: Rick Stevens.

THE COURT: Okay. All right, counsel. We're going to have to take --

MR. COYTE: And Officer Porter, if he's available tomorrow.

THE COURT: Okay.

MR. CALDWELL: And is that all the remaining witnesses?

THE COURT: You guys can talk about it, I need to run. Have a good evening.

(Proceedings in recess at 4:11 p.m.)

REPORTER'S CERTIFICATE

I, SUSAN B. SPERRY, do hereby certify that I did report in stenographic shorthand the proceedings as set forth herein, pages 1 through 23, inclusive, and that I was an Official Federal Court Reporter at that time.

WITNESS MY HAND AND SEAL this 12th day of February, 2012.

Susan B. Sperry, RDR, CRR, CBC