IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STEPHEN SLEVIN,

Plaintiff,

vs. No.1:08-CV-01185

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DONA ANA;
THE DONA ANA COUNTY DETENTION CENTER,
CHRISTOPHER BARELA,
and DANIEL ZEMEK,

Defendants.

---

PARTIAL TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

---

January 20, 2012
8:36 a.m.

HEARD BEFORE: HONORABLE MARTHA VAZQUEZ
United States District Judge
Santa Fe, New Mexico

A P P E A R A N C E S

For the Plaintiff: Matthew Coyte, Esq.
Jack Bennett Jacks, Esq.

For the Defendant: John W. Caldwell, Esq.

I N D E X


| | Page |
|---|---|
| Reporter's Certificate | 25 |

8:36.

(Jury not present.)

THE COURT: Good morning, everyone. Please be seated. I want to thank you for your briefs. I know that you stayed up pretty late getting me the additional information that I requested. But what I would like to do is, Mr. Caldwell, I'll start with you, if you don't mind approaching the podium.

As you identify the evidence that you would like to present, I'd like you to tell me who is responsible for initiating that action.

MR. CALDWELL: Your Honor, all of the items would have been Mr. Barela, and some of them concerning the temporary -- or the retention of the temporary employment agency and --

THE COURT: Okay. I'm looking at your brief.

MR. CALDWELL: You want me to start with the first one? The increase of wages and benefits of detention officers and members of the medical unit would have been Mr. Barela. Mr. Zemek would have been involved in the wages and benefits for members of the medical unit. The attempts to recruit and hire detention center officers would have been Mr. Barela. The health care providers would have been Mr. Barela and Mr. Zemek. The

retaining of the temporary employment agency would have been both Mr. Barela and Mr. Zemek. The multiple increases in the operating budget of the detention center would have been Mr. Barela. The issuing award or request for proposals would have been Mr. Barela. So, the improvement in mental health services would have been a result of Mr. Barela, including the increase in medical staff.

The increase in specialized training of defendants' detention center officers would have been Mr. Barela. The creation of mental health units would have been Mr. Barela. The addition of recreational yards would have been Mr. Barela. The building and operation of a crisis triage center, the idea or concept, I believe, began with Senator Papen.

THE COURT: These are all in the future tense. Does this mean they've not happened yet?

MR. CALDWELL: The funding, the drawing of plans have all been done for the crisis triage center. I don't know if ground has been broken yet, but it's been scheduled to.

THE COURT: Okay. Let me go back to, It will include specialized training. Has that happened?

MR. CALDWELL: It has, yes, Your Honor.

THE COURT: I need dates for all of these

things. Do you have dates for all of these things, when they happened?

MR. CALDWELL: I have approximate dates, yes, Your Honor. The wages and benefits for both the detention officers and medical unit started in December, 2005, probably, through February -- excuse me, December of 2005 through January, February of 2006. The attempts to recruit and hire detention center officers and health care providers began in December of 2005 going forward. The retaining of the temporary employment agency occurred in the middle of 2006. The multiple increases in the operating budget would have occurred -- proposals would have occurred probably in March of 2006 and March of 2007, and March of each subsequent year. The actual increases would have been approved July 1st of 2006 and 2007 and 2008.

The issuing and award -- issuing of the RFP occurred in either May or June of 2007. The award occurred in August or September of 2007. The signing of the contract involving the RFP occurred in December of 2007, and the contract was implemented in January of 2008.

So, the additional services provided by the private entity would have begun in January of 2008, including the increase in medical staff. The specialized

training of defendants' detention center officers occurred in 2008, first half of the year. But it's ongoing.

The creation of mental health units occurred -- or began in the middle of 2008. The addition of more recreational yards was proposed in 2007, but was not implemented until 2008.

THE COURT: Okay, hold on a second. It was proposed --

MR. CALDWELL: In 2007, probably in March of 2007.

THE COURT: And that was by Mr. Barela?

MR. CALDWELL: Yes, Your Honor.

THE COURT: You've got documentation for all of this?

MR. CALDWELL: Not with us. We have simply Mr. Barela's testimony.

THE COURT: So you don't have any documentation for any of this?

MR. CALDWELL: No, Your Honor. I mean, I can secure it.

THE COURT: Okay. That would be necessary.

MR. CALDWELL: All right.

THE COURT: And, I'm sorry, I interrupted you. Proposed in 2007 and implemented when? The recreational

yards, we were talking about.

MR. CALDWELL: Actually, in 2010.

MR. BARELA: The first one was done in 2010.

MR. CALDWELL: 2010.

THE COURT: And were any of those in the mental health unit?

MR. CALDWELL: They are accessed by people in the mental health unit, yes, Your Honor. In the mental health unit itself, there are no recreation yards. The mental health detainees are taken out of their unit to the new recreational yards.

THE COURT: And that change occurred when?

MR. BARELA: The initial construction was 2009.

MR. CALDWELL: 2009, when the yards were --

MR. BARELA: Ground broke.

MR. CALDWELL: When the ground broke for the recreational yards was in 2009.

THE COURT: Okay. Now, we're at the crisis triage center?

MR. CALDWELL: The proposal for the crisis triage center began, I believe, either in 2004 or 2005. The ground has not been broken for it yet.

THE COURT: So you don't know what year, you don't have anything?

MR. CALDWELL: Well, the actual proposal for

the crisis triage center did not originate with Dona Ana County, it originated with Senator Papen, but she could never secure enough funding. So the county decided --

THE COURT: Who is this individual?

MR. CALDWELL: Senator Papen. She's a state senator from southern Dona Ana County.

THE COURT: So how is this relevant to us?

MR. CALDWELL: Because it was the county -- the detention center, at the recommendation of Mr. Barela, the county decided to fund it itself without state funding. And, as Dr. Stone testified yesterday, she thought diversion of mental health detainees was important. It's the county, to facilitate the handling of mental health issues in the jail, decided on its own to fund the crisis triage center. The concept, the idea, originated with Senator Papen.

THE COURT: Okay. So, this is something that at some point was supported by Defendant Barela?

MR. CALDWELL: Yes, Your Honor, beginning probably in 2005/2006.

MR. BARELA: That's correct.

THE COURT: But you don't have any documentation?

MR. CALDWELL: No, Your Honor.

THE COURT: And tell me what about this Bravo

litigation that you anticipate we're going to get into. Your description is negotiations, agreements, implementation of the settlement agreement reached in the Bravo litigation.

MR. CALDWELL: That would involve the staffing of the mental health unit for medical and mental health care. It will also discuss the creation of the mental health units within the jail, and it will talk about not placing detainees with mental health issues in segregation without certain processes being satisfied.

THE COURT: Your brief talks about the testimony getting into negotiations of the Bravo litigation and the agreements. It doesn't just talk about the implementation of the settlement agreement.

MR. CALDWELL: I think it's important, Your Honor, that the jury understand. Mr. Coyte made a comment yesterday that it was something that we had to do, that we were forced to do, it was involuntary. However, disclosure about information involved in the negotiations will reveal that the county actually offered to do more than it was required to do constitutionally.

And I think that that's important because it goes to the state of mind, the intent of Mr. Barela and the county.

THE COURT: So you're saying that -- are we

going to get into the actual settlement agreement, and how the county actually went above and beyond the settlement agreement?

MR. CALDWELL: Yes, Your Honor.

THE COURT: So, is the settlement agreement an exhibit in this case?

MR. CALDWELL: It is not yet, no. I mean, it's not.

THE COURT: Not yet?

MR. CALDWELL: Well, no, Your Honor. I believe that Miss Koenigsberg can testify as to what the parties agreed to, as can Mr. Barela. I'm not sure the entire document is relevant to what the defendants are arguing or wish to argue.

THE COURT: Well, my concern is that we're going to get into this other lawsuit. And my concern is also that we're getting into some pretty remote areas here.

MR. CALDWELL: Your Honor, the only part of the settlement agreement we would cover in testimony would be the efforts made by the county to mediate the issues regarding the care for mental health detainees.

THE COURT: Punitive damages, though, are not being brought against the county, as you know. So the county's efforts are really irrelevant here.

MR. CALDWELL: As I've identified to the Court, every item, every piece of information which we seek to introduce, Mr. Barela was the motivating or primary moving factor.

THE COURT: Well, your brief was not so specific, that's why I've asked you to identify the parties' specific efforts. And that's why I've asked you what documentation you have, because your brief was pretty nebulous and general with regard to that.

Thank you.

MR. CALDWELL: Yes, Your Honor.

THE COURT: Mr. Coyte?

MR. COYTE: As my brief indicated, I couldn't find any Tenth Circuit law directly on point to help me here. I think what I did find was, it's within the Court's discretion. I think the main concern is that it appears that the defendants are talking about county attempts to ameliorate a problem that the head of the jail is participating in, in some way, and the ability to try and figure out what has actually been moved into action on behest of Mr. Barela, as opposed to county managers, county attorneys, litigation, responses to litigation, I think, is kind of impossible, especially given that we don't have any of the documentation that they're referring to.

So, although any remedial measures that this individual defendant put into place in 2005 and '06, I believe, would be acceptable, I don't -- I think there has to be some limit to it, just to avoid confusion of the jury, just on both a relevancy and a 403 analysis. And that if we start to open up a mini-trial into what the county's doing in terms of another lawsuit, or this -- if it's what the county was doing, of course, that wouldn't be relevant to this issue on punitive damages.

But if it's what this individual did in relation to a lawsuit, that we're going to have a whole new trial and we're going to need another week to flesh it out, potentially, if I even had the ability to confront the people on what they say, given we don't have the documentation.

THE COURT: Was there discovery on this issue?

MR. COYTE: Not that I'm aware of.

THE COURT: I mean in your case, not in the Bravo litigation that I'm hearing about today. But in this case, was there discovery on this issue?

MR. COYTE: The only -- we discovered in discovery in deposing people that another lawsuit had taken place. We then subpoenaed the Protection and Advocacy for any letters related to deliberate

indifference, and that's how we got the letters.

There's been no discovery on RFPs. I don't have a copy of the settlement agreement that they're referring to. I don't have any discovery about --

THE COURT: So you've never seen the settlement agreement?

MR. COYTE: Not that I'm aware of, no. And so breaking ground, I have no idea. I have no idea about a mental health crisis intervention unit until today. I have -- of course, I was told yesterday that they were intending to introduce evidence through Miss Koenigsberg about what had happened last week. I obviously have no knowledge of what happened last week. And I'm told the settlement agreement expires shortly. I don't know when that is, or why, or what will happen afterwards.

So, I guess from the plaintiff's perspective, I think you have discretion to allow them to get into it in terms of what's going on at the time, but there must be some limit to it.

THE COURT: Okay.

MR. CALDWELL: Your Honor, may I answer your question about discovery on Bravo being conducted in this litigation? Mr. Coyte asked Mr. Barela during his deposition in 2009 about the Bravo litigation. He was provided copies of Mr. Barela's deposition from the Bravo

litigation. He was provided copies of Dr. Stone's deposition in the Bravo litigation. He was aware of Nancy Koenigsberg. He may have limited his subpoena, but I think it went beyond the letters, also probably went to documents related to Bravo. But he had the opportunity to subpoena those documents from her or to ask us for them, and he chose not to. He chose not to depose Miss Koenigsberg or anyone related to the Bravo deposition for whatever reason.

But for him to say here today that he was unaware of Bravo and its relationship to mental health issues within the jail is incorrect. He knew as early as 2009, shortly after he filed this litigation, about Bravo and about what that litigation concerned.

THE COURT: Mr. Caldwell, this isn't -- one can be aware that there is another case entitled Bravo. I mean, I know how much our magistrate courts limit discovery. It isn't a question of whether the plaintiff was aware of another litigation. It's a question of the amount of evidence we are going to permit in this case about other litigation.

That is always a trial court's concern about how much evidence we get into about other litigation. It's always everyone's nightmare, this has become a mini-trial about another lawsuit. I mean, we had

anticipated that this -- you all had anticipated that we would be done today, that this case would be finished with the evidence today. And look where we are.

I mean, if you had anticipated that we were going to get into the Bravo litigation, you would have mentioned it to me at the pretrial conference. I never even heard of the Bravo litigation. Neither of you mentioned it at our pretrial conference. I mean, a heads-up to me would have been nice when we had a pretrial conference. Motion for summary judgment by either one of you would have been nice. Some heads up would have been nice, when we would have been able to discuss this.

The point is, is that this kind of thing requires some level of anticipation so that it could be discussed. It's not that the Bravo case was a secret to plaintiff's counsel. It's that the role that it plays in this case is something that obviously wasn't fully anticipated. And I don't want to turn this case into a mini-trial of whatever this Bravo case was about.

You are entitled, not for purposes of the county, but to the extent the plaintiff is seeking punitive damages against Mr. Zemek and Mr. Barela, you are entitled to introduce -- and you may sit down, you don't need to stand -- but you are entitled to introduce

some evidence with regard to remedial action.

But it is only remedial action that was attempted or introduced at the initiative -- but you must show that it was at the initiative of Mr. Zemek or Mr. Barela, not by somebody else. I think it is -- it must be shown that it is done by Mr. Zemek or Mr. Barela, it is not evidence that was initiated by the county. It's for the purpose of punitive damages. And, therefore, your brief was kind of sloppy about, These are all the things that were done. And it was not specific as to actions that came at the behest or that were done by Mr. Barela or Mr. Zemek.

And because you didn't identify, either by date or by the party, it was very difficult to be able to tell whether they should be admissible or not. I will require you to link the evidence to Mr. Zemek, to Mr. Barela. And also, since Mr. Zemek left, it will be very important for you to be very careful, in terms of making sure that the evidence be carefully linked to one party or the other, and not to both, since we know that, at some point in time, I'm not recalling right now when it was, that Mr. Zemek left the employment of the facility.

Also, I am going to limit the period of time. I don't think it is appropriate to allow evidence up until the present time. I think it is important to limit

the period of time in which I will permit evidence to be introduced with regard to remedial action that the facility had made improvements with regard to remedial actions. And I will limit it to that period of time in which the plaintiff has been allowed discovery in this case. Otherwise, the plaintiff has no way to be able to document whether in fact these improvements are accurate, have been made, or can verify them.

So, I don't know what period -- when discovery ended in this case, but that is information that the two of you have. So, it will end at that time.

I'm also going to require that you produce the settlement agreement in this case, and make that available to the plaintiff, and to the Court, as well. I'm not going to require that you introduce it, but I am going to require that you make it available.

I believe that's it. And it is now 9:00. So, are the jurors in here or are they outside?

MS. ZIEBA-ROMERO: They're in the jury assembly room.

THE COURT: Let's take a five-minute recess to let the jurors come into the courtroom and then we'll get started.

MS. DAVIS: Judge, there's one other thing they want to talk to you about.

THE COURT: Okay. There's something else?

MR. CALDWELL: Your Honor, six days before trial started, plaintiff produced additional medical records of plaintiff to us. In going through those records -- and those records had not been supplemented for more than a year since the end of discovery. But in going through those records, defendants learned that the plaintiff was diagnosed with lung cancer back in April of 2011.

And we think that this is a material issue to the -- material to the issue of damages. Because what we would have done is then asked to identify the oncologist who made the diagnosis to determine the effect, or the impact on plaintiff's life expectancy. Since this case is primarily about damages, the defendants have been deprived of the opportunity to inquire into plaintiff's lung cancer and what stage it is and what the impact on his life expectancy is.

So defendants would ask either that you allow us to continue this matter so that we can retain an expert to look at those records once the plaintiff has produced them for us --

THE COURT: So he was diagnosed in April of last year?

MR. CALDWELL: Of 2011. Plaintiff just

produced the records to us nine days ago, or ten days ago.

THE COURT: Why did you not ask then? Why did you not ask nine days ago?

MR. CALDWELL: Because I hadn't reviewed the records until last night.

THE COURT: We could have not started the trial.

MR. CALDWELL: I understand, Your Honor. But plaintiff has known about his diagnosis and had a duty to supplement --

THE COURT: I'll get to the plaintiff soon. But, Mr. Caldwell, we could have not started the trial nine days ago. That would have been an easy solution nine days ago, instead of impaneling a jury trial. You couldn't have just opened the file and looked at the records?

MR. CALDWELL: I could have, Your Honor, but it's about 20 pages back in the records. Again, I apologize to the Court. I agree that I should have looked at them when they were produced electronically to me. But we reviewed them last night in preparing for Dr. Grassian's testimony today.

And the plaintiff never disclosed to me that he had been diagnosed with lung cancer. Our discovery

request asked them to identify every health care provider and provide the records. And plaintiff --

THE COURT: I don't dispute they should have been provided, Mr. Caldwell. I don't. But you didn't get a voluminous file. The easy thing, since you didn't file any motions pretrial, it's not like I got a ton of work from you, you could have opened the file. You would have been granted a continuance on the spot.

But you wait until we've impaneled a jury in this case, and we are into trial, to tell me? You tell me now that you've got these records? You wait until now? You could have done it -- you could have done it the first day of trial. Why do you wait until now? Did you just review the records last night?

MR. CALDWELL: That's what I said, Your Honor. I apologize to the Court. But I didn't feel like reviewing the records was necessary until preparing for Dr. Grassian's testimony here today.

THE COURT: This is unbelievable, Mr. Caldwell. All right. Thank you.

Mr. Coyte, why on earth would you wait so long to reveal your client's medical records?

MR. COYTE: Your Honor, the medical records in question -- I didn't have any medical records to reveal. Mr. Caldwell and I, a month or two ago, in preparation

for the trial, were discussing his current condition. Mr. Caldwell asked me to supplement his medical records. At that moment, I got on the phone to his current provider. We discussed, Mr. Caldwell and I, the ability to get the records as quickly as possible. They arrived in my office and we sent them to him that day, or within -- within the next morning of them arriving in the afternoon. So we got him the medical records as soon as we had them.

This is not related to Mr. Slevin's claims. We haven't, in our expert report, given any actuarial type of information or life expectancy-type information. And there's nothing -- so, I just did, as soon as I got them, I gave them to him, Your Honor. And they have a medical release from him, pursuant to discovery.

The fact is that the case became so old, in terms of -- Mr. Slevin lives on the east coast and he developed a medical condition.

THE COURT: Do you have any information with regard to what stage of the cancer he is at?

MR. COYTE: The medical record reflects stage one cancer and chemotherapy.

THE COURT: All right. Well, then, we're going to do the best we can. You can contact his doctor, you've got a medical release.

MR. CALDWELL: Actually, Your Honor, we don't even know who the doctor is. What we have is records from the mental health provider who simply says that Mr. Slevin reports he's been diagnosed with cancer. It identifies the surgeon who is going to treat Mr. Slevin, but it does not identify the oncologist who made the diagnosis.

So if we had a medical release, we don't know, and plaintiff has not identified who the oncologist is who made the diagnosis and who would have staged it.

THE COURT: Okay. You need to do that.

MR. COYTE: I actually don't know.

THE COURT: Well, then, you will find out today, provide the oncologist, have your client fill out a medical release form today.

MR. COYTE: Okay, yes.

THE COURT: And provide that. We will -- because of the difference in time, I'm going to recess early this afternoon so that Mr. Caldwell can contact his physician and you can get on the phone with him, as well. Might make more sense to have a longer lunch hour so that the two of you can get on the phone, with your client, and contact his oncologist this afternoon and get on the phone with him and answer questions. Do whatever you need to do.

But it's too late to do anything about this trial.

MR. COYTE: Okay.

THE COURT: All right? So, maybe at lunch, you can get your paralegal to contact the doctor and set up a telephone conference this afternoon.

MR. COYTE: We will do our best to do that.

THE COURT: All right. So, get him the telephone number as soon as possible, the name. Get a release signed immediately, and get an appointment for this afternoon so that you can set up a telephone conference. And I expect you, Mr. Coyte, to provide all the professionalism and cooperation possible to address this issue.

MR. COYTE: I will, Your Honor. And may my client step outside with my paralegal while we present testimony so they can figure these details out?

THE COURT: That would be fine. All right. Thank you.

Five minutes, so we can get the jury in and we can get started. And if you can have your next witness on the stand ready to go. Mr. Caldwell?

MR. CALDWELL: So for the record, Your Honor, our request for a continuance is denied?

THE COURT: Yes, at least at this time. I'm

assuming this matter is going to be able to get worked out in this way.

(Proceedings in recess from 9:08 a.m. to 9:15 a.m.)

(End of requested portion of transcript.)

REPORTER'S CERTIFICATE

I, SUSAN B. SPERRY, do hereby certify that I did report in stenographic shorthand the proceedings as set forth herein, pages 1 through 24, inclusive, and that I was an Official Federal Court Reporter at that time.

WITNESS MY HAND AND SEAL this 12th day of February, 2012.

________________________________

Susan B. Sperry, RDR, CRR, CBC