IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEPHEN SLEVIN,

        Plaintiff,

    vs.                                         Civil No. 08-cv-1185 MV/DJS

BOARD OF COMMISSIONERS FOR THE
COUNTY OF DOÑA ANA, et al.,

        Defendants.

## MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendants' Motion to Disqualify and Memorandum in Support Thereof [Doc. 57]. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, entered an Order [Doc. 68] denying Defendants' Motion. This Opinion sets forth the Court's rationale for that decision.

## BACKGROUND

Plaintiff Stephen Slevin commenced the instant action on December 28, 2008. *See* Doc. 1. Plaintiff had been arrested on state charges of driving while intoxicated and receiving or transferring a stolen vehicle, and was booked into the Doña Ana County Detention Center (the "Detention Center") on August 24, 2005. *Id.* at 2. He remained at the Detention Center until June 25, 2007, when the charges against him were dismissed. *Id.* at 4. Plaintiff alleged that, because of his mental illness, officials at the Detention Center kept him in administrative segregation for virtually the entire 22 months of his incarceration, without humane conditions of confinement or adequate medical care, and without periodic review of his confinement, causing his physical and mental deterioration. *Id.* at 2-4. Based on these allegations, Plaintiff claimed

that Defendants violated his procedural due process and substantive due process rights and his rights under the Americans with Disabilities Act, and committed the torts of false imprisonment and negligent maintenance of a building.  *Id.* at 4-7.

The case was assigned to this Court two days later, on December 30, 2008, *see* Doc. 4, after Plaintiff filed his Refusal to Consent to Proceed Before a U.S. Magistrate Judge.  Doc. 3.  In the Pretrial Order, entered on February 24, 2011, Defendant listed a "Motion to Recuse" as a potential motion to be filed.  *See* Doc. 51 at 8-9.  Also on February 24, 2011, the Court scheduled trial for August 15, 2011.  *See* Doc. 52.  On June 27, 2011, the Court notified the parties that trial would be rescheduled for January 17, 2012.  *See* Doc. 55.  On December 1, 2011, Defendants filed the instant Motion to Disqualify this Court.  Other than the instant motion, neither party filed any pretrial motions for consideration by this Court.

Defendants argue that recusal is required under 28 U.S.C. Sections 455(a) and (b)(1).  The factual basis for Defendants' motion rests entirely on three affidavits describing two visits I made to the Detention Center on March 3 and April 15, 2009, in an effort to acquire information regarding federal detainees housed there.  *See* Doc. 57 at 2-4.  At the time of my visits, the parties in this matter had not yet appeared before me and had filed no motions for my consideration.  Rather, only the Magistrate Judge assigned to this matter had issued orders in this case, namely the Order Adopting Joint Status Report and Joint Scheduling Order, both entered on April 1, 2009.  *See* Docs. 14 & 15.

The affidavit of Bryan Baker, an employee at the Detention Center, alleges that I visited the Detention Center on March 3, 2009, in response to a complaint I had received from a federal detainee. Doc. 57-1, ¶ 3.  The affidavit notes that I visited "day rooms 1, 2 and 3 of X Block where federal detainees are housed," and expressed specific concerns regarding the housing of

federal detainees, including sleeping on "boats," insufficient uniforms for regular exchange, plumbing, personal hygiene supplies, processing of grievances, and medical care.  *Id.* ¶ 4.  The affidavit further notes that I advised that, if the Detention Center was not able to care for the federal detainees, they would be removed from the facility.  *Id.* ¶ 5.  Further, wholly separate from my visit to the Detention Center, the affidavit notes that, at least a month before my March visit, an unidentified Deputy U.S. Marshal, at my request, had requested information about an incident involving a federal detainee whose head injury had not been treated.  *Id.* ¶ 6. The Deputy Marshal allegedly told Mr. Baker that I would "twist[ his report] in the most negative way possible."  *Id.*

In addition, the affidavit of Cheryl Roach, the Facility Administrator at the Detention Center, alleges that she accompanied me on a tour of the Detention Center on April 15, 2009. Doc. 57-2, ¶ 3.  The affidavit notes that I visited the medical unit and then spoke with federal detainees in their housing unit about their complaints.  *Id.* ¶ 5.  The affidavit further alleges that the U.S. Marshal told Ms. Roach that I had told him "to remove all federal detainees out of the Detention Center."  *Id.* ¶ 7.

Finally, the affidavit of Christopher Barela, Director of the Detention Center and a Defendant herein, alleges that he joined me on the tour of the Detention Center on April 15, 2009, and that I advised him I was there to follow up on complaints I had received from federal detainees concerning hot water, clean blankets and towels, and sack lunches, and to investigate concerns that federal detainees were not receiving adequate medical care or hygiene supplies. *Id.* ¶ 4.  The affidavit notes that I requested copies of certain federal detainees' medical records. *Id.* ¶ 5.  Further, the affidavit alleges that the U.S. Marshal told Mr. Barela that I wanted the U.S. Marshals Service to remove all federal detainees from the Detention Center, and that Mr. Barela

overheard me "tell the U.S. Marshal that the Marshals Service should remove all federal detainees from the Detention Center." *Id.* ¶¶ 4-5.

## DISCUSSION

I.  Legal Standard

    A.  Section 455(a)

Under Section 455(a), a judge "shall disqualify [her]self in any proceeding in which h[er] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The standard is an objective one: "what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). In the Tenth Circuit, the test is "whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993) (citation omitted). This inquiry "is limited to outward manifestations and reasonable inferences drawn therefrom." *Id.* Initially, the inquiry is "whether a reasonable *factual* basis exists for calling the judge's impartiality into question." *Id.* (emphasis in original).

The Tenth Circuit has cautioned that "[S]ection 455(a) "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Id.* "Neither is the statute intended to bestow veto power over judges or to be used as a judge shopping device." *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995). Accordingly, "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Cooley*, 1 F.3d at 994.

Finally, "cases within § 455(a) are extremely fact driven and must be judged on [their] unique facts and circumstances more than comparison to situations considered in prior

jurisprudence." *Nichols*, 71 F.3d at 351. Nonetheless, the Tenth Circuit has compiled "a non-exhaustive list" of matters generally insufficient to warrant recusal under Section 455(a), which includes "rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters." *Id.*

B.  Section 455(b)(1)

Section 455(b)(1) provides that a judge shall disqualify herself if she has "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). Under this standard, a judge must actually hold a bias or prejudice, or have personal knowledge of the dispute facts. *See Liteky*, 510 U.S. at 552-53, 553 n.2 (distinguishing between subjective bias or prejudice proscribed by Section 455(b)(1) and the objective appearance of bias or prejudice proscribed by Section 455(a)). "[T]his standard is not violated by every judicial predisposition; the pejorative nature of the terms 'bias' and 'prejudice' connotes a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate." *United States v. Young*, 45 F.3d 1405, 1415 (10th Cir. 1995). Further, the acquisition of an alleged bias or prejudice from an extra-judicial source is neither a necessary nor a sufficient condition for recusal. *Liteky*, 510 U.S. at 554.

C.  Timeliness of Motion to Recuse

"The remedy for judicial prejudice is a motion for recusal that 'must be timely filed,' and a party must act promptly in filing its motion once it knows of the facts on which it relies." *Levy v. Levitt*, 3 F. App'x 944, 951, 2001 WL 184230, **5 (10th Cir. 2001) (quoting *Willner v. Univ. of Kansas*, 848 F.2d 1023, 1028 (10th Cir. 1988) (finding motion for recusal untimely where movant obtained information at least one year prior to filing motion); *see also United States v. Pearson*, 203 F.3d 1243, 1276 (10th Cir. 2000) ("[O]ur precedent requires a party to act

promptly once it knows of the facts on which it relies in its motion."). Timeliness is required on a motion to recuse both to "conserve[] judicial resources and to alleviate[] the concern that it is motivated by adverse rulings or an attempt to manipulate the judicial process." *Pearson*, 203 F.3d at 1276; *see also Willner*, 848 F.3d at 1029 ("Granting a motion to recuse many months after an action has been filed wastes judicial resources and encourages manipulation of the judicial process.").

II.     Defendants' Motion to Recuse

Defendants make two arguments in support of their motion for recusal. First, Defendants argue that, under Section 455(a), a reasonable person, knowing all of the circumstances, would harbor doubts about the Court's impartiality because: (1) the Court "had *ex parte* discussions with defendant Barela and supervisory employees of defendant Doña Ana County concerning conditions of confinement [that] occurred while this case was pending and without the presence or knowledge of defendants' counsel of record"; and (2) "[b]y its comments to the U.S. Marshals Service either relayed to defendants or overheard by defendants, the Court has expressed its belief that the Detention Center does not adequately provide for its detainees." Doc. 57 at 6-7. Second, Defendants argue that, under Section 455(b)(1), the Court: (1) has personal knowledge of disputed facts in this case obtained from an extra-judicial source, namely, my visit to the Detention Center and my review of medical charts of certain federal detainees; and (2) has a personal bias or prejudice against the Detention Center, constructively inferred from the Court's alleged statement that "it wanted the U.S. Marshals Service to remove all federal detainees from the Detention Center." Doc. 56 at 7. As discussed herein, Defendants have failed to provide a sufficient basis to justify recusal under either Section 455(a) or 455(b)(1).

A.  Defendant's Section 455(a) Argument

Defendants first argue that the Court's impartiality is called into question by what Defendants label "*ex parte* discussions," citing my visits with "defendant Barela and supervisory employees of Defendant Doña Ana County concerning conditions of confinement . . . without the presence or knowledge of defendants' counsel of record." Doc. 57 at 6. Defendants, however, point to no communications by this Court that meet the definition of "*ex parte*." An *ex parte* communication is "[a] communication between counsel and the court when opposing counsel is not present." *United States v. Freeman*, No. 10-20635, 2011 WL 2669664, * 8 (E.D. Mich. July 8, 2011) (quoting Black's Law Dictionary (9th ed. 2009)). Similarly, the term "*ex parte*" itself means "[o]n one side only; by or for one party; done for, in behalf of, or on the application of, one party only." *United States v. Forbes*, 150 F. Supp. 2d 672, 677 (D.N.J. 2001) (quoting Black's Law Dictionary (6th ed. 1990)).

None of the affidavits submitted by Defendants includes any allegations that this Court communicated with Plaintiff's counsel without the presence of defense counsel, or that any applications were made to the Court by or on behalf of Plaintiff without notice to defense counsel. To the contrary, Defendants argue only that the Court had discussions with *Defendants themselves*. Regardless of whether such discussions took place without the presence of defense counsel, any such alleged discussions provide no basis for Defendants to complain of improper *ex parte* communications by the Court.

Moreover, the Code of Conduct for United States Judges prohibits only *ex parte* communications "*concerning a pending or impending matter* that are made outside the presence of the parties or their lawyers." Canon 3(A)(4) (emphasis added). Defendants' affidavits make clear that the subject of my visits to the Detention Center and the discussions that I had there

were about conditions of federal detainees, and complaints I had received from specific federal detainees who were housed at the Detention Center.  There is no evidence that any of my discussions with Defendant Barela or any other staff involved Plaintiff or the instant case.  Accordingly, Defendants have failed to point to any communications with Detention Center staff that call into question the fair and impartial performance of my duties.

Next, Defendants argue that a reasonable person would doubt the Court's impartiality matter because of my comments to the U.S. Marshals Service allegedly expressing my "belief that the Detention Center does not adequately provide for its detainees."  Doc. 57 at 7.  This argument is untenable for several reasons.  First, as noted above, Defendants' affidavits make clear that the subject of my visits to the Detention Center was the conditions of confinement of federal detainees, including their access to medical care, and complaints I had received from specific federal detainees who were housed at the Detention Center.  I made these visits in my capacity as Chief Judge of the District of New Mexico.  A chief district judge has an obligation to perform administrative duties and judicial functions in overseeing the integrity of the judicial system, which obligation includes ensuring the adequacy of conditions of confinement of federal detainees and inmates.  *See* 28 U.S.C. §§ 137-37; Federal Judicial Center, Deskbook for Chief Judges of U.S. Dist. Courts §§ 1-2 (3d ed. 2003).  As Chief Judge, I was kept apprised by the U.S. Marshals Service, the United States Probation Department, members of the federal bar, and federal detainees themselves regarding conditions at detention facilities.  When problems associated with conditions of confinement, including medical care, arose, I addressed those concerns by directing the complaints to the proper authority and, if necessary, physically inspecting the subject facility.  In addition to the Detention Center, I visited numerous other detention facilities housing federal inmates and detainees, including facilities in Texas and South

Dakota.  Such visits by federal judges to inspect jail conditions are not uncommon.  *See Alberti v. Sheriff of Harris County*, 937 F.2d 984, 987 (5th Cir. 1991) (in about 1975, district judge, after visiting facilities, concluded that conditions in the jails were "inhumane"); *Campbell v. McGruder*, 580 F.2d 521, 538 (D.C. Cir. 1978) (district court made unannounced visit to District of Columbia jail and found that more than 200 persons were held in violation of the court's order regarding space requirements); *Rutherford v. Baca*, No. CV 75-04111, 2006 WL 3065781 (C.D. Cal. Oct. 27, 2006) (court made two visits to Los Angeles jail and observed overcrowding to such a degree that a finding of a constitutional violation would be warranted); The MacArthur Justice Center, Northwestern School of Law, *Judge Decides to Visit Cook County Jail to See Overcrowded Conditions* (Media Advisory, Feb. 1, 2008) (calls people sleeping on floor "unconstitutional," wants overcrowding addressed).  Further, the statements I allegedly made to the U.S. Marshal were not public announcements, but rather were private communications made to the authority responsible for securing housing for federal detainees and overseeing their medical care.  Accordingly, neither my visits to the Detention Center nor my communications to the U.S. Marshal regarding federal detainees would convey to a reasonable person that I have such an uncommon interest or degree of personal interest in the subject matter of conditions of confinement that I would be unable to fulfill my role as detached adjudicator in a case brought by a plaintiff, such as the one here, alleging unconstitutional conditions of confinement.  *See Cooley*, 1 F.3d at 995.

  Second, the factual distinctions between the instant case and my visits to the Detention Center are significant.  This case involves the conditions of Plaintiff's confinement when he was held at the Detention Center from August 2005 to June 2007, in the administrative segregation block.  At that time, the Medical Director of the Detention Center was Daniel Zemek.  Plaintiff,

who was detained on a state charge, brought constitutional claims arising from his placement and retention in solitary confinement, allegedly as a result of his mental illness.  In contrast, my visits to the Detention Center occurred in March and April of 2009, almost two years after Plaintiff had been released, and at a time when Mr. Zemek was no longer employed at the Detention Center.  Defendants' affidavits indicate that I visited federal detainees in the X block where they were housed, a unit separate and apart from where Plaintiff had been housed.  My visits were in response to specific complaints from federal detainees, and addressed the sole issue of the adequacy of the conditions and care of the federal detainees housed at the Detention Center.  Defendants have provided no evidence to suggest that any of my discussions with Detention Center staff involved the use of administrative segregation, to house mentally ill detainees or otherwise.

     Defendants nonetheless argue that recusal is required because both this case and my visits to the Detention Center concerned "adequate medical care and conditions of confinement."  Doc. 57 at 7.  This similarity, however, is at too high a level of generality to demonstrate the inextricable intertwinement of subject matter necessary to call into question my impartiality.  *See Cooley*, 1 F.3d at 995.  Indeed, as Plaintiff notes, my concern as Chief Judge about federal detainees receiving adequate medical care and humane treatment "is likely to be shared by many federal jurists whose judicial role requires them to review multiple civil rights complaints and habeas corpus petitions each year.  It is the type of concern that comes with the territory, yet it does not mean a judge cannot be impartial" when acting as an adjudicator in an individual case.  Doc. 60 at 5.  Under these circumstances, a decision to recuse would be an abdication of the Court's "obligation not to recuse when there is no occasion for [her] to do so."  *Nichols*, 71 F.3d at 351.

Third, in arguing that a reasonable person would question my impartiality, Defendants misrepresent my statements. Mr. Baker's affidavit indicates that I advised him that *if* the Detention Center were not able to care for the federal detainees, they would be removed from the facility. Doc. 57-1, ¶ 5. It is not reasonable to interpret this statement as an expression of an already-formed "belief that the Detention Center does not adequately provide for its detainees." Doc. 57 at 7. The only other statements regarding removal of federal detainees to which the Defendants' affidavits refer are statements that Ms. Roach and Mr. Barela allegedly overheard me make to the U.S. Marshal, or that the U.S. Marshal allegedly relayed to Mr. Barela. Docs. 57-2, ¶ 7, 57-3, ¶¶ 4-5. The affiants' descriptions of my alleged statements, taken out of context and overheard or heard second-hand, amount to no more than "rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion," and thus fail to provide the factual basis necessary to call my impartiality into question.[1] *Nichols*, 71 F.3d at 351. Similarly, the alleged disparaging comment about me made to Mr. Baker by an unidentified Deputy U.S. Marshal speculating that I would negatively "twist" his report on an injured federal detainee, Doc. 57-1, ¶ 6, is insufficient to cause a reasonable person to question my impartiality.

    B.    <u>Defendants' Section 455(b)(1) Argument</u>

Defendants argue that, under Section 455(b)(1), the Court: (1) has personal knowledge of disputed facts in this case obtained from an extra-judicial source, namely, my visit to the Detention Center and my review of medical charts of certain federal detainees; and (2) has a personal bias or prejudice against the Detention Center, constructively inferred from the Court's

---

[1] These descriptions of my statements are also inaccurate, as I did not advise that I wanted the federal detainees removed from the Detention Center.

-11-

alleged statement that "it wanted the U.S. Marshals Service to remove all federal detainees from the Detention Center." Doc. 56 at 7. Neither of these arguments is availing.

First, although my visits to the Detention Center arguably would constitute "an extra-judicial source," that fact alone is not a sufficient condition for recusal. *See Liteky*, 510 U.S. at 554. Defendants have provided no evidence to suggest that, through my visits, I obtained "personal knowledge of disputed evidentiary facts concerning th[is] proceeding." 28 U.S.C. § 455(b)(1). None of my discussions with Detention Center staff, nor my review of the medical records of certain federal detainees, involved Plaintiff, the conditions of the Detention Center during the period of Plaintiff's detention, or the Detention Center's policies regarding the use of administrative segregation, to house mentally ill detainees or otherwise. Indeed, at the time of my visits, this proceeding had not yet been brought to my attention, by court appearances, motions or otherwise. To say that, on a general level, the facts of this case and the subject of my visits both involved adequate medical care and conditions of confinement is a far cry from establishing that I had personal knowledge of the disputed evidentiary facts in this case.

Second, as discussed above, the only statement allegedly made by me that is reliable enough to be considered in deciding whether the Court is biased is my alleged statement to Mr. Baker that, *if* the Detention Center was not able to care for all of the federal detainees, they would be removed from the facility. That statement, however, reflected not a personal bias or prejudice against the Detention Center, but rather my concerns, as Chief Judge, to ensure that there were enough beds for each of the federal detainees, and that no federal detainees were forced to sleep on "boats." These are the same concerns that I had regarding the safety and well-being of all federal detainees, wherever they are housed. Such concerns are not the sort of "judicial predisposition" that violates Section 455(b)(1). *See Young*, 45 F.3d at 1415.

Indeed, the standard under Section 455(b)(1) requires that a judge "actually hold a bias or prejudice." *Liteky*, 510 U.S. at 552-53, 553 n.2. Defendants agree that only the Court is in a position to know whether it actually holds a bias or prejudice. Doc. 66 at 1. After its own searching inquiry, the Court assures Defendants that it holds no such bias or prejudice.

C.  Defendants' Motion is Untimely

Defendants' motion to recuse stems from my two visits to the Detention Center, which occurred in March and April of 2009. Defendants thus knew of the facts on which they rely in their motion as early as April 2009. Nonetheless, Defendants waited until December 1, 2011 to file their motion. Indeed, Defendants considered seeking recusal as early as February 2011, as they included "motion to recuse" in the Pretrial Order as a potential motion to be filed. Doc. 51 at 8-9. Rather than file their motion promptly, Defendants waited to file their motion for more than two and one-half years after acquiring the facts on which their motion is based, and for nine months after they first indicated to the Court the possibility of the motion. When Defendants filed their motion on December 1, 2011, the trial date had been set for seven months, and the first day of trial was only six weeks away.

By waiting to file their motion until the eleventh hour, Defendants placed a cloud of uncertainty over the trial, negatively impacting Plaintiff's ability to prepare and manage the numerous witnesses expected to testify on his behalf. To date, Defendants have offered no explanation for this delay. Defendants' unexplained delay in filing their motion raises the spectre of improper motivation. Granting a motion to recuse under these circumstances would waste judicial resources and encourage manipulation of the judicial process. *See Pearson*, 203 F.3d at 1276; *Willner*, 848 F.3d at 1029.

**CONCLUSION**

Defendants have failed to establish that recusal is proper under either 28 U.S.C. Section 455(a) or 28 U.S.C. Section 455(b)(1).  Further, their motion to recuse is untimely.

Accordingly, as set forth in the Court's Order [Doc. 68], Defendants' Motion to Disqualify and Memorandum in Support Thereof is denied.

DATED this 7th day of March, 2012.

_____
MARTHA VÁZQUEZ
United States District Judge