IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEPHEN SLEVIN,

Plaintiff,

vs. No. CIV 08-01185 MV/SMV

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DONA ANA, THE
DONA ANA COUNTY DETENTION CENTER,
CHRISTOPHER BARELA, and DANEL ZEMEK,

Defendants.

**MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL ON DAMAGES OR, IN THE ALTERNATIVE, REMITTITUR**

**Introduction**

> It is not the duty of jurors to set aside, even if it were possible, all the decencies of human emotion when called upon to decide controversy. It is the duty of jurors not to allow emotion to overcome fact, not to allow sympathy to overcome reason, not to allow desire for result to overcome justice.

Barnes v. Smith, 305 F.2d 226, 229 (10th Cir. 1962). Sometimes a diligent and properly instructed jury nonetheless fails in this task. In such a case, "[t]he court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice." 11 Charles A. Wright et al., Federal Practice and Procedure § 2805, at 55 (2d ed. 1995).

The court's power and duty arise under Rule 59, Fed. R. Civ. P. Defendants have moved for a new trial on damages or for remittitur pursuant to that rule. The court "always may grant relief if the verdict is excessive or inadequate as a matter of law" and "also may grant a new trial if the size of the verdict is against the weight of the evidence." Wright § 2807, at 78-79.

Additionally, "[i]f the court finds that a verdict is unreasonably high, it may condition denial of the motion for a new trial on plaintiff's consent to a remittitur." Id. at 86.

A new trial or remittitur is appropriate here. The jury's verdict is the product of passion and prejudice. Plaintiff's eight-figure recovery is excessive on its face. The jury's passion likely was aroused by the nature of the case, as well as by evidence and events at trial that drove the damages to an unreasonable level. The jury did not abide by this Court's instructions to employ "dispassionate common sense" and "sound discretion" in assessing damages. (Tr. (1/23/12) at 988-89.) It now falls to the Court to correct this manifest injustice.

**Argument**

**THE VERDICT IS EXCESSIVE, WARRANTING A NEW TRIAL OR REMITTITUR**

From opening statements, this case has been mostly about damages. It would be foolish to contend that the jury's liability determination itself was the product of passion and prejudice, after Defendants largely conceded the point. It would be foolish to deny the existence of substantial evidence supporting an award of compensatory damages. But even where the jury's determination of liability and its decision to award damages are beyond challenge, the verdict must be set aside if the damages awarded are "so excessive . . . as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." Barnes, 305 F.2d at 228. So it is here.

**A. The Compensatory Damages Award Is Facially Excessive.**

"Plainly excessive damages . . . may support an inference that bias, passion or prejudice contributed to the award." Fitzgerald v. Mountain States Tel. & Tel. Co., 68 F.3d 1257, 1262 (10th Cir. 1995).

The jury awarded Plaintiff $15.5 million as compensation for the injuries he suffered during 22 months of detention and continued to suffer for four years afterwards through the time of trial. (Doc. 96, Special Verdict.) Of this amount, only approximately $200,000 can be attributed to the cost of medical treatment under the evidence presented. (See Tr. (1/20/12) at 744-46.) There was no evidence of lost wages or other economic loss. More than $15 million of the compensatory damages award therefore is attributable solely to the intangible elements of pain, suffering, and emotional distress experienced by Plaintiff over approximately six years – the nearly two years Plaintiff was in custody and the four years following his release.

The Court, of course, is familiar with the evidence of inadequate care, neglect, and inattention that Plaintiff endured during detention and the resulting physical suffering and lasting mental injury he sustained. The evidence and the injury are not to be minimized. But no reasonable calculus can value Plaintiff's compensatory damages at $6 million per year of incarceration, as the jury did. (See Doc. 96, Special Verdict.) The damages are "plainly excessive" and likely the product of passion and prejudice.

Plaintiff's counsel, in closing, asked for a total award of $6 million in compensatory damages. (Tr. (1/23/12) at 1002-03.) Granted, counsel was careful to leave room for the jury to make a higher assessment. (Id. at 1003.) It remains, though, that – in a context in which counsel would not be inclined to hold back, and knowing well the evidence he presented – Plaintiff's counsel characterized a $6 million award as "fair compensation" for all of Plaintiff's injuries. (Id. at 1003.) The jury awarded more than two and one-half times Plaintiff's own estimate of just compensation.

Further demonstration that the award is facially excessive comes from considering damage awards in other cases that are comparable to the present case in various respects and

therefore informative about community and judicial attitudes regarding fair compensation. See Wulf v. City of Wichita, 883 F.2d 842, 875 (10th Cir. 1989). In McClary v. Coughlin, 87 F. Supp. 2d 205 (W.D.N.Y. 2000), for instance, an inmate was placed in administrative segregation and kept there for a period of four years in violation of his due process rights. Dr. Stuart Grassian, Plaintiff's expert here, testified about "[t]he effects of prolonged isolation" on the claimant. Id. at 211. The court held that an award of $650,000 in compensatory damages had to be set aside as excessive.

> Evaluating excessiveness in the context of an individual spending four, uninterrupted years in SHU [an administrative segregation unit] solitary confinement is no easy task. [The claimant] himself testified to the conditions of SHU confinement and the resulting devastation such isolation had on his mental and physical health . . . . The expert testimony of Dr. Stuart Grassian as to the damage caused by years of isolation in a toxic environment such as SHU was compelling and certainly supported a substantial verdict.

Id. at 218.

The court, however, was "convinced that the jury's verdict on damages was excessive" when it considered the amount of damages awarded in other cases of improper isolated imprisonment and the amount of damages that had been requested by the claimant. Id. Noting that other cases had awarded damages of $100 to $125 per day for unlawful segregated confinement and that the claimant demanded damages of $150 per day in his supplemental complaint, the court contrasted those amounts with a damages award that "translates into a per diem award of almost $500 per day." Id.

In contrast, in Smith v. Rowe, 761 F.2d 360, 368 (7th Cir. 1985), the court held that an award of $80,000 for 22½ months in unconstitutional punitive isolation, equating to approximately $119 per day, was "neither monstrously excessive nor shocking." The court pointed to awards of $129 per day and $219 per day that it had previously upheld on similar

claims. Id. See also Ford v. Bender, No. 07-11457, 2012 WL 262532, at *10, *16 (D. Mass. Jan. 27, 2102) (375 days of unconstitutional segregated confinement resulting, according to Dr. Grassian, in "serious mental anguish" compensated "at a rate of $100/day," which "seems generally consistent with awards in comparable situations"); Nettles v. Griffith, 883 F. Supp. 136, 145 (E.D. Tex. 1995) (considering "acceptable range" of compensatory damages for wrongful placement in administrative segregation to be approximately $30 to $154 per day, depending on how egregious the circumstances); see generally 1B Martin A. Schwartz, Section 1983 Litigation § 16.07[H], at 16-141 n.648 (4th ed. 2011) (surveying per diem awards for unconstitutional confinement; indicating that many such awards cluster around a $100 per day figure, with the highest noted award for unlawful administrative segregation being $500 per day).

Relatedly, in cases involving prolonged wrongful imprisonment and the resultant deprivation and emotional distress, a number of courts have awarded compensatory damages of approximately $1 million per year, see Drumgold v. Callahan, 806 F. Supp. 2d 405, 426-27 (D. Mass. 2011) – a benchmark that itself is "high enough to be troubling" and "approach[es] the outermost boundary of what might be thought conscionable," Limone v. United States, 579 F.3d 79, 106 (1st Cir. 2009). And in cases involving severe, lasting emotional injuries including PTSD, compensatory damages awards commonly run in the six-figure range. See Sulkowska v. City of New York, 129 F. Supp. 2d 274, 309 n.53 (S.D.N.Y. 2001).

In the present case, the jury awarded $500,000 for every month Plaintiff spent in administrative segregation. (See Doc. 96, Special Verdict.) That award is equivalent to more than $16,000 for each day and amounts to $6 million in compensation for one year of confinement – as much as Plaintiff had requested for the entirety of his injury. No argument

based on the circumstances of Plaintiff's individual case, compelling as those circumstances may be, can justify this tremendous deviation from the norm and from reason in determining a compensatory damages award.

In view of the foregoing, the Court should conclude that the jury's compensatory damages award is excessive on its face both in light of the evidence and as a matter of law, that passion and prejudice doubtless contributed to the excessive award, and that the award should be remitted or a new trial should be granted on damages.

**B. The Nature of the Case, Evidence, and Events at Trial Make It Likely That the Compensatory Damages Award Is the Result of Passion and Prejudice.**

One need not resort only to inference based on the size of the verdict to recognize that passion and prejudice most likely influenced the award of damages in this case. Opportunities abounded at trial for the flames of passion to enter into the jury's consideration.

To begin, a case that depicts the treatment accorded jail detainees in one of the state's more populous counties as glaringly deficient is, by its very nature, inflammatory. The graphic evidence presented at trial surely contributed to this impression. The before-and-after photographs of Plaintiff (Exs. 1 & 2), which emerged in opening statement, were used in examining witnesses throughout the trial and in Plaintiff's closing argument, and went to the jury room, vividly portray Plaintiff's degeneration into a disheveled, unkempt, withdrawn, and haunted individual during his period of incarceration. This evidence, clearly admissible because it is so probative, see Fed. R. Evid. 403(b), had the equal capacity to arouse shock, anger, and disgust.

Also strong in its impact was John Oates's testimony describing the sounds, smells, and experiences of life as a detainee under administrative seclusion in the Dona Ana County jail.

> [T]here's a lot of people being locked in a room all day and they start to talking to themself, screaming. They kind of lose a grip on who they are. And, you know, bags of feces would be thrown in the day room and they would be left there sometimes. And the whole pod just smelled horrible.

(Tr. (1/19/12) at 510.) Oates was further permitted to testify about the manner in which some prisoners were treated by correctional officers, even though there was no evidence that Plaintiff was subjected to such treatment. He told the jury about visits from the "S.W.A.T. team" (id. at 505) and the "goon squad" "in full riot gear" (id. at 513) who he testified would cuff, shackle, and mace detainees (id. at 505, 513).

Plaintiff did not testify. Oates, however, testified about the psychological impact that isolated confinement had upon him (e.g., Tr. (1/19/12) at 501-02) and in that way served as Plaintiff's proxy before the jury. During trial, Oates was permitted to testify, over objection (id. at 502), about his experience having again been isolated in the court's basement holding cell while waiting to give his testimony. Asked how the experience made him feel, he testified that he "started having anxiety and panic attacks" and that it was "hard to cope," "real stressful," and "hard [for him] to breathe." (Id. at 501-02.)

At the end of Oates's testimony the Court addressed him, saying that it was "sorry about" what had happened to Oates in the holding cell. (Id. at 535.) The jury was present to hear this statement. Well-meaning as it may have been, the Court's expression of sympathy and apology toward Oates, the proxy-Plaintiff, could only have suggested to the jury that Plaintiff, too, was owed an apology by society in the form of substantial damages. The Court's judicial endorsement of Plaintiff's claim very likely loosened the jury's inhibitions and contributed to the size of the verdict.

The jury, by its reckoning on the special verdict form and through the foreperson's statements in open court, explicitly adopted a "per diem" method of determining Plaintiff's

compensatory damages. It awarded $500,000 per month for the 23 [sic] months that Plaintiff was in detention plus $1 million per year for each year following Plaintiff's release. See Doc. 96, Special Verdict; Tr. (1/24/12) at 1062.) While not improper, a per diem method of determining damages presents a particular risk of excessiveness because it imparts a false sense of certainty to an arbitrarily selected figure representing unquantifiable physical or emotional distress, which then is simply compounded mathematically by whatever unit of time is selected. See Joseph H. King, Jr., Counting Angels and Weighing Anchors: Per Diem Arguments for Noneconomic Personal Injury Tort Damages, 71 Tenn. L. Rev. 1, 27-33 (2003); see also id. at 10 (per diem approach is "one of the most influential techniques affecting the magnitude of damages awarded at trial"). "By arbitrarily magnifying awards for pain and suffering, per diem [calculations] literally compound the illogic of attempting to monetize pain and suffering into a damages remedy." Id. at 11.

The artificiality of the per diem method is especially evident in this case, where the jury assigned an arbitrary value of $500,000 in compensatory damages for every month that Plaintiff was held in detention – more than twice what Plaintiff's counsel characterized as a just remedy for the intangible injury Plaintiff incurred. See supra p. 3. When that figure was multiplied, the damages mathematically ballooned to their present, excessive value.

Finally, the jury's communications with the Court during its deliberations show that the jury plainly was inclined toward punishing Defendants. Cf. Barnes, 305 F.2d at 229-30 (reflecting that it is appropriate to review jury notes in analyzing an excessive damages argument). In one note the jury asked who would be responsible for paying compensatory and punitive damages; in another it sought financial information from which to ensure that a punitive damages award would be "felt." (Doc. 94, Notes from Jury & Court's Responses.)

The jury, however, could not award punitive damages against the County. See City of Newport v. Facts Concerts, Inc., 453 U.S. 247 (1981). Yet the evidence presented to support the "policy or long-standing practice" element of Plaintiff's claim could easily have led the jury to feel that the County, too, was deserving of punishment. The evidence sharply contrasted conditions at the County-run jail with the more humane conditions described by Paul Bagwell and John Oates at facilities in Las Vegas and Los Lunas. (Tr. (1/19/12) at 464, 466, 469-70, 476-78, 486-93, 495, 514-17.) This evidence had the capacity to inflame a jury already disposed toward punishment to punish the County as well in the only way it could: by inflating its award of compensatory damages. Cf. Lewis v. Bd. of Sedgwick County Comm'rs, 140 F. Supp. 2d 1125, 1140 (D. Kan. 2001) (inferring from the fact that the jury awarded twice the amount of damages asked for by the plaintiff's attorney an intent by the jury to punish the county), aff'd in part, rev'd in part on other grounds, No. 01-3158/3172, 2003 U.S. App. Lexis 542 (10th Cir. Jan. 14, 2003).

A purportedly compensatory award that is infected by a punitive purpose accomplishes the impermissible: it visits "upon the shoulders of blameless or unknowing taxpayers" the responsibility to pay "in effect a windfall to a fully compensated plaintiff," which is "likely to be accompanied by an increase in taxes or a reduction of public service for the citizens footing the bill." City of Newport, 453 U.S. at 267. The Court should act to prevent this result.

The factors outlined above provided opportunities and reasons for passion and prejudice to affect the jury's award of compensatory damages. They demonstrate why the inference, drawn from the size of the award, that the jury was influenced by passion and prejudice in this case is a reliable one. A new trial or grant of remittitur is therefore necessary.

**C. The Punitive Damages Awards Also Are Excessive.**

The punitive damages awards are as susceptible to inflation by passion and prejudice as the compensatory award. The jury in fact awarded greater punitive damages against Defendant Zemek than Plaintiff's counsel requested in closing, indicating that, as with the compensatory damages, strong feelings were at work. (See Tr. (1/23/12) at 1007 (arguing for $3 million punitive award against each individual defendant); Special Verdict (awarding $3.5 million in punitive damages against Zemek).) Because the compensatory award was colored by jury passion and prejudice and because nothing indicates that the punitive awards were not similarly affected, the punitive damages awards should be presumed to have been driven to excessive levels by the jury's unchecked emotions.

**Conclusion**

The jury's shockingly large verdict demonstrates on its face that it is the product of passion and prejudice, and therefore it should not stand. The verdict exceeds any reasonable determination of compensation for the injuries Plaintiff incurred.

It is easy to understand how the jury's passion could have been inflamed in this case. The nature of the case, the graphic and affecting evidence, and the Court's apologetic comment to witness Oates all doubtless contributed to arouse the jury's emotions beyond the point that any instruction to be dispassionate or fair in assessing damages could have any curative effect. The jury's adoption of a per diem method to set compensation for intangible harm that cannot readily be quantified contributed to the excessiveness of the award. The jury's manifest desire to punish likely spilled over to infect the compensatory damages awarded against the County.

While the jury's determination of liability cannot seriously be challenged in light of the evidence, there is every reason to believe that passion and prejudice "invaded the trial" and led to

an award of excessive damages in this case. Barnes, 305 F.2d at 228. The Court therefore should grant a new trial on damages pursuant to Rule 59, Fed. R. Civ. P. Alternatively, the Court should grant remittitur and condition the denial of a new trial on Plaintiff's acceptance of a damages award that is just under the evidence, community standards of compensation, and judicial standards of excessiveness. Based on the standards adopted in the cases cited above, a remittitur of compensatory damages to $500,000 for each of Plaintiff's two years of confinement and $250,000 per year for each of the four years thereafter, totaling $2 million, plus punitive damages not to exceed $250,000 against each individual defendant, would provide the maximum proper award of damages and would achieve a fair and just result for all parties in this case.

Respectfully submitted,

*/s/ John W. Caldwell*
John W. Caldwell
P.O. Box 1405
Fairacres, NM 88033-1405
Telephone: (575) 647-7225
Fax: (800) 665-1285

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
Edward Ricco
Jocelyn Drennan
P.O. Box 1888
Albuquerque, NM 87103-1888
Telephone: (505) 765-5900
Fax: (505) 768-7395

*Attorneys for Defendants*

CERTIFICATE OF SERVICE

I certify that on March 16, 2012, I filed the foregoing electronically through the CM/ECF system, which caused parties or counsel of record in this matter to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/ John W. Caldwell*
John W. Caldwell