IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEPHEN SLEVIN,

    Plaintiff,

v.                                                                                  No. CIV 08-01185 MV/SMV

BOARD OF COMMISSIONERS FOR THE
COUNTY OF DOÑA ANA, et al.,

    Defendants.

### DEFENDANTS' RENEWED AND SUPPLEMENTED RECUSAL MOTION

Pursuant to Rules 59 and 60(b), Fed. R. Civ. P., Defendants renew and supplement their previously filed motion to disqualify the Court from presiding in this case. (Doc. 57.) Defendants request that the Court reconsider its prior refusal to recuse itself and that the Court now recuse and grant a new trial as a consequence of its earlier failure to do so. Defendants alternatively request that, at a minimum, the Court remove itself from consideration of further matters in this case, including Defendants' request herein for a new trial and Defendants' other post-trial motions for a new trial or other relief. This motion is opposed.

Defendants present this motion with respect, but also with the conviction that the Court's investigation of conditions at the Dona Ana County Detention Center ("DACDC") and interaction with Defendant Barela and other agents of the County, all outside the confines of the present case, require recusal under the objective standard of 28 U.S.C. § 455(a) ("impartiality might reasonably be questioned") and the subjective standard of 28 U.S.C. § 455(b)(1) ("personal knowledge of disputed evidentiary facts"). Defendants believe that the Court's reasons for declining to recuse are not sufficient to justify denial of the initial motion to disqualify, and they further believe that events at trial demonstrate both an additional basis for

recusal under Section 455(a) and additional prejudice to Defendants resulting from the Court's earlier failure to recuse, emphasizing the need for a new trial.

## RELEVANT FACTS

### The Court's Involvement in This and Similar Cases

This case involves a claim by Plaintiff that he was subjected to unconstitutional conditions of confinement, including inadequate care for his physical and mental health conditions, while detained for 22 months at the DACDC. (Doc. 1.) The Court was assigned to preside over the case on December 30, 2008. (Doc. 4.)

At the time Plaintiff filed this lawsuit, a separate putative class action lawsuit, *Bravo, et al. v. Board of County Commissioners of Dona Ana County, et al.*, 6:08-cv-00010 (now WJ-KBM), was pending. (*Bravo* Doc. 1.)[1] *Bravo* was filed on behalf of current and future inmates incarcerated at the DACDC against the Board of County Commissioners of Dona Ana County and Defendant Barela, among others. (See id. (Compl.).) Upon his admission to the DACDC, Plaintiff became a member of the putative class. The *Bravo* complaint alleged that the defendants violated the state and federal constitutions and the Americans with Disabilities Act by failing to properly assess and provide treatment to mentally ill inmates. (*Id.* ¶¶ 96-110.) The Court was assigned to preside over the *Bravo* case on January 8, 2008. (*Bravo* Doc. 18.)

On March 3 and April 15, 2009, while it was presiding over both the *Bravo* lawsuit and this case, the Court made two visits to the DACDC. During those visits, the Court inspected parts of the facility, made inquiries to Defendant Barela as the director of the facility and to other agents of the County about the management of the facility and treatment of inmates, obtained

---

[1] A court may "take judicial notice of its own files and records, as well as facts which are a matter of public record." *Van Woudenberg ex rel. Foor v. Gibson,* 211 F.3d 560, 568 (10th Cir.2000), *abrogated on other grounds by McGregor v. Gibson,* 248 F.3d 946 (10th Cir.2001).

copies of the medical records of some inmates, and expressed concern about continuing to house federal prisoners in the facility if satisfactory conditions could not be maintained there.  (*See* Doc. 57, Exs. A-C.)

In May 2009, the Court issued a memorandum opinion and order recusing itself in another case, *McClendon et. al., v. City of Albuquerque, et. al.,* Civ. No. 95-24 (then MV/ACT), that involved allegations of inhumane conditions at a detention facility.  (*McClendon* Doc. 718.) The Court recused itself in response to a motion filed by one of the defendants in the lawsuit. The motion, in relevant part, pointed to the Court's visits to that facility and *ex parte* communications with officials named as defendants in the case.  (*McClendon* Doc. 702.)  Based upon 28 U.S.C. § 455(a), the Court reasoned that it should recuse itself because its "expression of its opinion regarding RCC [Regional Correctional Center – a facility which had recently been incorporated into the *McClendon* litigation] in the past, is sufficient for a reasonable person to infer that the Court *may not be impartial* in this case now that RCC has been identified as a facility subject to this lawsuit."  (*McClendon* Doc. 718, at 15 (emphasis added).)  Three days later, the *Bravo* case was reassigned to another judge.  (*Bravo* Doc. 136.)

**Denial of Motion to Disqualify**

Following these developments in the *McClendon* and *Bravo* lawsuits, the Court continued to preside over the present case.  In initially moving for disqualification here, Defendants raised the Court's visits to the DACDC in March and April of 2009.  (Doc. 57.)  Defendants argued that the Court's involvement with the DACDC required recusal because the involvement created an objective basis to doubt the Court's impartiality and because the involvement provided the Court with personal knowledge of evidentiary facts obtained outside this litigation.   The Court denied

3

the motion (Doc. 68) and later entered a memorandum opinion explaining its reasoning (Doc. 112).

## Remedial Measures

An issue arose at trial concerning Defendants' desire to introduce evidence of remedial measures that Defendants had undertaken to ameliorate the inadequate conditions at DACDC. There was little dispute over the relevance of at least some such evidence, which pertained both to the due process issue of deliberate indifference and to the culpable mental state of the individual defendants who were subject to punitive damages. (See Doc. 83, at 2.) At first the Court ruled that the evidence was admissible with certain restrictions. (Tr. (1/20/12) at 685-87.) Later the Court reversed itself, agreeing with Plaintiff that the issue of remedial measures had not been disclosed in the pretrial order and broadly excluding the evidence. (Tr. 1/23/12) at 874-75.) As a consequence, Defendants lost their opportunity to rebut Plaintiff's evidence tending to show that Defendants were deliberately and culpably indifferent to the conditions to which Plaintiff was exposed.

## John Oates

John Oates was called by Plaintiff to testify about his experience while housed in segregation in the same unit of the DACDC as Plaintiff and about the effect of that confinement on him. He testified that as a result of his treatment at the DACDC he incurred psychological injury. (E.g., Tr. (1/19/12) at 500-01.)

On the day he was scheduled to testify, Oates was placed in isolation in the Court's holding cell to await being called. He began to experience again the psychological distress that he claimed was caused by his segregated confinement. During a trial recess, Oates described his recurrent distress to the Court. (Tr. (1/18/12) at 430-33.)

The next day, when he eventually was called to testify, Oates was allowed to describe, over defense counsel's objection, his emotional distress of the previous day. (Tr. (1/19/12) at 501-03.) When Oates completed his testimony and was being excused as a witness, the Court stated to him, in the jury's presence, "I'm sorry about yesterday." (*Id.* at 535.)

## ARGUMENT

In its memorandum opinion and order denying Defendants' initial motion to disqualify, the Court rejected certain factual allegations as unreliable. But the Court did not deny the key events: the Court's two inspection visits to the DACDC, its communication with Defendant Barela and other agents of the County during those visits, its request for and review of the medical records of a number of detainees, and its statement (Doc. 112, at 12) that "if the Detention Center was not able to care for all of the federal detainees, they would be removed from the facility" (emphasis omitted).

These events are sufficient to have required recusal under 28 U.S.C. § 455, both because they created reasonable doubt about the Court's impartiality and because they provided the Court with personal knowledge of relevant evidentiary facts. The Court's memorandum opinion and order rejects this result, but the Court's reasoning does not adequately respond to the concerns of the recusal statute. Furthermore, the Court's conduct relating to John Oates, occurring after the initial refusal to recuse, creates further ground for reasonable doubt about the Court's impartiality, was prejudicial to Defendants, and requires that a new trial now be granted.

**A.    This Court was required to recuse itself because its impartiality could reasonably be questioned.**

In the initial motion to disqualify, Defendants asked this Court to recuse itself pursuant to Section 455(a) on the ground that a reasonable person, knowing all the relevant facts, would harbor doubts about the Court's impartiality. The request was based on the Court's two site

5

visits to the DACDC while this case was pending, its discussions with Defendant Barela and other agents of the County outside the presence of defense counsel concerning conditions at the facility, and its statement to a DACDC corrections officer that if the facility could not provide appropriate care and treatment to federal detainees they would be removed. (Doc. 57, ¶ 16(a).)

Defendants relied upon the express language of Section 455(a), which states: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Defendants also relied upon the provision's underlying policy goal: "to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988).

The test is objective. *Higganbotham v. Oklahoma ex rel. Oklahoma Transp. Comm'n*, 328 F.3d 638, 644-45 (10th Cir. 2003). If a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality, recusal is necessary. *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993) (internal quotation marks & citation omitted). "The judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue." *Id.*

If the question of whether Section 455(a) requires disqualification is a close one, the balance tips in favor of recusal. *United States v. Dandy,* 998 F.2d 1344, 1349 (6th Cir. 1993). Tipping the balance toward the recusal side is "the recognized need for an unimpeachable judicial system in which the public has unwavering confidence." *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980).

Against this backdrop, the reasons set forth in the Court's memorandum opinion for denying Defendants' initial motion to disqualify do not meet fully the concerns addressed by Section 455. The Court therefore should reconsider its decision denying recusal.

### *Ex Parte Communications*

Relying in part on *United States v. Forbes,* 150 F. Supp. 2d 672, 677 (D.N.J. 2001), the Court concluded that its conversations with Defendant Barela and other agents of the County did not constitute *ex parte* communications. (Doc. 112, at 7.) In so concluding, the Court narrowly defined an *ex parte* communication as one occurring "between counsel and the court when opposing counsel is not present." (*Id.* (internal quotation marks & citation omitted).) The Court pointed out that Defendants had not submitted any evidence that such a communication had occurred. (*Id.*)

That position contradicts the one that the Court adopted in its recusal opinion in *McClendon*. There, the defendants asserted that the Court had engaged in e*x parte* communications with named defendants, among others, at the correctional facility in question. The Court disagreed, reasoning that neither the facility guards with whom the Court communicated or the two high ranking Defendants with whom she spoke in 2007 were named Defendants in relation to the facility at the time of the communications. (*McClendon* Doc. 718, at 10.) The Court relied on *Forbes,* which in relevant part states, "this term [*ex parte*] contemplates that one actually be a party to a matter before the communication of another party is considered '*ex parte*.'" (*McClendon* Doc. 718, at 10 (internal quotation marks omitted) (alteration omitted).)

That is precisely the situation in this case. Defendant Barela was a party in not one, but two, cases involving allegations of unconstitutional conditions of confinement and inadequate

7

medical care when the Court questioned him about conditions of confinement and the provision of medical care to inmates at the DACDC.  (*See* Doc. 1 (Complaint (filed 12/23/08), Doc. 57, Ex. C ¶¶ 3-4.)  Based on the Court's own prior reading of the law as set forth in the recusal order in *McClendon*, communication with any named defendant in a matter over which the Court presides constitutes an *ex parte* communication.

As an additional rationale, the Court invoked the Code of Judicial Conduct for United States Judges for the proposition that only *ex parte* communications "concerning a pending or impending matter" are prohibited.  (Doc. 112, at 7 (emphasis omitted).)  It reasoned that the Defendants' affidavits made clear that the Court's inquiries related to federal detainees rather than to the subject matter of this case.  (*Id.* at 7-8.)  That is too fine a distinction, however.  The adequacy of medical care and the conditions of confinement at the DACDC are precisely the matters at issue in this case.  The Court has not sufficiently explained why its communication with Defendant Barela and other County officials about conditions at the DACDC during the pendency of this lawsuit should not have disqualified it from presiding in this matter.

### *Site Visits*

The Court stated that the two site visits it made to the DACDC were undertaken "in my capacity as Chief Judge of the District of New Mexico."  (Doc. 112, at 8.)  It further explained that "[a] chief district judge has an obligation to perform administrative duties and judicial functions in overseeing the integrity of the judicial system, which obligation includes ensuring the adequacy of conditions of confinement of federal detainees and inmates."  (*Id.*)  In support, the Court cited 28 U.S.C. §§ 13[6]-137 and the Federal Judicial Center Deskbook for Chief Judges of U.S. District Court §§ 1-2 (3d ed. 2003).  (*Id.*)

But none of this authority authorizes or places the onus on a chief judge to ensure that the constitutional needs of federal detainees are met in a detention center generally or when litigation involving a detention center is pending before the judge. For example, 28 U.S.C. § 136 sets forth the criteria required for a federal district judge to become the chief judge, who may serve as chief judge, term limits, and situations in which the chief judge is temporarily unable to perform his or her duties. The statute provides nothing more. Similarly, 28 U.S.C. § 137 provides only that the chief judge "shall be responsible for the observance of such rules and orders, and shall divide the business and assign the cases so far as such rules and orders do not otherwise prescribe." The Deskbook for Chief Judges of U.S. District Court also does not support the Court's actions in this case. While the deskbook provides guidance on the managerial and leadership role of the chief judge in overseeing the efficiency and effectiveness of the district court as a whole, it does not provide the authority to investigate complaints and or engage in extra-judicial fact finding, particularly where cases are pending that involve the very institution which is the subject of the presiding judge's inquiry.

Furthermore, however true it may be that "visits by federal judges to inspect jail conditions are not uncommon" (Doc. 112, at 9), that is simply beside the point. It is not that a federal judge has no business ever investigating jail conditions. Rather, it is that a judge whose duties require him or her to do so should not at the same time preside over a case involving those same conditions and privately question named defendants in the suit about subjects which are involved in the case.

The Court also drew distinctions between the issues in the present case and its site visits to the DACDC. The Court noted that Plaintiff's suit involves his incarceration at the DACDC from August 2005 through June 2007, when Defendant Daniel Zemek was the medical director,

whereas the site visits occurred almost two years after Plaintiff's release from the DACDC, at which time Defendant Zemek was no longer employed by the facility. (Doc. 112, at 9-10.)

What matters is not when the site visits occurred, but rather the fact that they occurred while Plaintiff's case was pending before this Court and that the Court inquired into subjects that were germane to the case. And, although Defendant Zemek had left the DACDC facility by the time the Court visited it, Defendant Barela, the director, had not. The Court specifically questioned Defendant Barela about conditions of confinement and medical care, both of which are areas of dispute in this case.

The Court additionally noted that the site visits were limited to the unit where federal detainees were housed, rather than the area where Plaintiff was housed. (*Id.* at 10.) The Court stated that the sole focus of the site visits was to address conditions of confinement and care for federal detainees housed at the Detention Center, rather than to investigate the facts of Plaintiff's incarceration or administrative segregation policies related to mentally ill federal detainees or inmates generally. (*Id.*) Again the distinction is too fine. Knowledge gained about conditions in one part of the facility could logically be extrapolated to other parts under common management and supervision. A reasonable observer would consider the Court's inquiry leading to information plausibly relating to conditions throughout the facility to indicate a lack of impartiality in any matter involving conditions within the facility.

### *Statement Regarding Removal of Inmates*

The Court considered it unreasonable to interpret as indicative of bias its statement to a DACDC corrections officer that if the detention center was not able to care for the federal detainees, they would be removed from the facility. (Doc. 112, at 11.) Given that this statement was made in the context of the Court expressing concerns about sleeping arrangements, hygiene

supplies, insufficiency of uniform exchanges, plumbing issues, and emphasis on medical care (*see* Doc. 57, Ex. A, ¶ 4), a reasonable observer could readily conclude that the Court had made a determination related to these issues and sought to force change by indicating that the federal detainees would be removed if alterations were not made.

> **B.     This Court was required to recuse because of its personal knowledge of disputed evidentiary facts.**

Defendants also asked this Court to recuse itself under Section 455(b)(1) on the ground that the Court's inquiries, on-site inspections, and review of medical records gave it personal knowledge of disputed facts regarding inmate medical care and conditions of confinement at the DACDC. (Doc. 57, ¶¶ 16b, 16c.) In response, the Court restated its view that its discussion with DACDC staff and review of medical records for a number of federal detainees did not involve Plaintiff, his conditions of confinement during the time of his incarceration, or DACDC segregation policies. (Doc. 112, at 12.) The Court felt that knowledge "on a general level" did not amount to knowledge of evidentiary facts in the present case. (*Id.*) In addition, the Court stated that this case had not been brought to its attention through court appearances or motions practice. (*Id.*)

As previously discussed, however, the Court's distinctions do not adequately address the concerns of the recusal statute or its underlying policies. The DACDC comprises a single facility under the management and operation of the County and the overall supervision of Defendant Barela as director. When the Court obtained factual information about conditions in one part of the facility and about the medical care provided to some detainees, by logical extension it obtained information about conditions elsewhere in the facility, including the Fox 2 unit, and about the care accorded to other inmates, including Plaintiff. The Court's knowledge of

11

facts pertinent to these matters, obtained outside the process of the present litigation, required the Court's recusal under Section 455(b)(1).

> C. **The Court previously has determined that where the appearance of impropriety permeates a case, recusal is warranted even where a recusal motion has not been timely filed.**

In this case, the Court concluded that Defendants' recusal motion was not timely filed. (Doc. 112, at 13.) But that position, too, appears inconsistent with the one the Court took in *McClendon*.

There, the Court determined that where an appearance of impropriety exists, recusal is warranted despite a failure to timely file a recusal motion. In its memorandum opinion and order, the Court stated: "The County's explanation for its almost two-year delay in filing the present motion is unpersuasive. The law is clear that a § 455 motion must be filed when the facts on which it relies are known to the moving party, which in this case was in the summer of 2007." (*McClendon* Doc. 718, at 12.) The Court went so far as to chastise the movant in that case for breaching ethical standards by filing a motion for disqualification that the Court believed was motivated by an unfavorable ruling. (*Id.* at 14-15.) Nevertheless, the Court determined that its "foremost obligation is to promote public confidence in the integrity and independence of judges. This obligation outweighs the Court's obligation to quell inappropriate litigation tactics in this case." (*Id.* at 15.) Accordingly, the Court recused itself, reasoning:

> Avoiding even the appearance of [impropriety] is important and necessary to uphold public confidence in the integrity of the Court and its ability to make fair and impartial decisions. This is the utmost concern of the Court and the reason recusal is appropriate.

(*Id.* at 16.)

The Court's reasoning aligns with that of other courts reviewing untimely recusal motions. *E.g., United States v. Bayless*, 201 F.3d 116, 130 (2d Cir. 2000) ("We repeat that there

12

may well be circumstances in which no timely recusal motion is made, but in which the damage done to the appearance of justice is so egregious that, despite the moral hazard created, recusal would be warranted under § 455(a)."); *Edgar v. K.L.*, 93 F.3d 256, 257 (7th Cir. 1996) ("Delay can be fatal, although after *Liljeberg* passage of time is not conclusive if the justification for disqualification is compelling." (citation omitted)); *Smith v. Danyo,* 585 F.2d 83, 86 (3d Cir.1978) (timeliness is but one of the factors which engages a court's discretion in determining whether a judge shall be relieved from its assignment).

The Court's reasoning in *McClendon*, as well as that of other courts, applies equally in this case. That reasoning makes clear that the appearance of impartiality is the paramount concern, not the timing of a recusal motion.

### D.     The Court's failure to recuse should be remedied by the grant of a new trial.

For the reasons outlined above, the Court erred in failing to recuse itself on Defendants' initial motion to disqualify. When a court has erroneously failed to recuse, the appropriate remedy is determined through the analysis described in *Liljeberg*. *See Harris v. Champion*, 15 F.3d 1538, 1571 (10th Cir. 1994). As stated in *Liljeberg*:

> [I]n determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

486 U.S. at 864.

The circumstances here do not permit the Court's failure to disqualify itself to be viewed as inconsequential. *Cf. Harris*, 15 F.3d at 1572 (presenting the "very unusual situation" in which the disqualified judge served as one member of a three-judge panel). Instead, they call for an effective remedy, consistent with the principle that "justice must satisfy the appearance of justice." *Cooley*, 1 F.3d at 998 (internal quotation marks & citation omitted).

In *Cooley*, where a district judge's conduct demonstrated "an uncommon interest and degree of personal involvement in the subject matter" of the case before him, such that "a reasonable person would harbor a justified doubt as to his impartiality," the Tenth Circuit held that the appropriate remedy was to vacate the results of a jury trial and to remand the case for a new trial before a different judge. *Id.* at 995, 998. The same relief is proper here.

As in *Cooley*, public confidence in the judicial process will be undermined if the judgment in this case is allowed to stand. The Tenth Circuit in *Cooley* mandated a new trial even though it concluded that the district judge displayed no actual bias, "was courteous to the defendants and sedulously protected their rights." *Id.* at 996. It was enough that a judge who should have recused because of an appearance of partiality presided over the trial.

In the present case as well, a Court that should have recused when Defendants' initial motion demonstrated an objective basis to question the Court's impartiality instead continued to preside over the case, including through a trial that had tremendous consequences for Defendants. During trial the Court was called upon to rule on such critical issues as the admissibility of Defendants' evidence of remedial measures, *supra* p. 4, a discretionary matter on which the Court ruled both pro and con and ultimately excluded the evidence. It is destructive of public confidence when a Court that has exhibited an objective appearance of partiality presides at a trial and makes rulings on consequential issues and the result is permitted to stand.

The Court's interaction with John Oates during the trial provides an additional reason why the Court's earlier failure to recuse should result in a new trial. Oates was an important witness for Plaintiff, because Plaintiff himself never took the stand. In testifying about the psychological injury he suffered as a result of being held in segregated confinement at the DACDC, Oates served as a stand-in for Plaintiff.

On the day of his scheduled testimony, Oates made known to the Court that he was experiencing renewed emotional distress that was triggered by being isolated in the Court's holding cell while awaiting his time to testify. *Supra* p. 4. Oates was not called to testify as scheduled. On the following day, however, Oates testified about the psychological harm that confinement in administrative segregation had caused him. Over Defendants' objection, with the Court aware of what was to come, Oates also was permitted to recount the emotional upset he had experienced while waiting in the holding cell the day before. *Supra* p. 5. The purpose of Oates's testimony about his claimed injury and its lasting effects, including those he experienced during the course of trial, was to present Oates's experience as representative of Plaintiff's own situation.

When Oates completed his testimony, the Court apologized to him in open court, within the sight and hearing of the jury, saying "I'm sorry about yesterday." (Tr. (1/19/12) at 535.) The Court's statement, though it may be accounted for as a gesture of human kindness, nonetheless projected empathy for Oates's – and thus Plaintiff's – distress. It was prejudicial to Defendants because it suggested that society owed Plaintiff, too, an apology. It legitimized Plaintiff's claims.

The Oates incident, which could not have been raised in Defendants' initial motion to disqualify, is itself a compelling basis to require recusal. Moreover, the incident would not have occurred if the Court had not erroneously declined to recuse itself in response to Defendants' initial motion. It provides further justification for a new trial because it demonstrates the presence of another *Liljeberg* factor: injustice to Defendants if the verdict of a jury that was exposed to the Court's apologetic comment to Oates is not set aside. "[T]here is a greater risk of

unfairness in upholding the judgment . . . than there is in allowing a new judge to take a fresh look at the issues." 486 U.S. at 868.

Ultimately, "[t]he guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact." *Id.* at 869-70 (internal quotation marks & citation omitted). Following that guidance, a new trial is required.

### E. At a minimum, the Court should disqualify itself from ruling on whether Defendants are entitled to a new trial or other post-trial relief.

The Court's failure to disqualify itself on Defendants' initial motion requires the Court both to recuse and to grant a new trial. *Supra* Point D. Defendants not only request a new trial on that ground, but they are filing, concurrently with the present motion, separate motions presenting additional grounds for a new trial or other relief. The Oates incident, even standing alone, would require recusal under Section 455(a) because of the appearance of partiality it presents. At a minimum, therefore, the Court should disqualify itself from this point forward and allow another judge to determine whether Defendants are entitled to a new trial or other relief on any ground advanced by Defendants in this or their other post-trial motions.

### CONCLUSION

For the foregoing reasons, the Court should reconsider its decision not to disqualify itself on Defendant's initial motion and should conclude that its failure to recuse at that time was error. The Court should consider the additional ground for recusal relating to the Oates incident at trial and should conclude that recusal and a new trial are warranted because its failure to recuse earlier was prejudicial to Defendants and to the interests protected by the recusal statute and can only be remedied by a new trial. At a minimum, the Court should recuse itself at this point and allow a successor judge to determine whether Defendants are entitled to a new trial or other relief

for the reasons stated in the present motion or another of Defendants' post-trial motions.

Respectfully submitted,

/s/ John W. Caldwell
John W. Caldwell
P.O. Box 1405
Fairacres, New Mexico 88033-1405
T: 575.647.7225
F: 800.665.1285
*Attorney for Defendants*


CERTIFICATE OF SERVICE

I certify that on March 16, 2012, I filed the foregoing electronically through the CM/ECF system, which caused parties or counsel of record in this matter to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

/s/ John W. Caldwell
John W. Caldwell