IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEPHEN SLEVIN,

   Plaintiff,

               Civil No. 08-cv-1185 MV/SMV

 vs.

BOARD OF COMMISSIONERS FOR THE
COUNTY OF DOÑA ANA, et al.,

   Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Defendants' Motion for New Trial on Damages or, in the Alternative, Remittitur [Doc. 120].   The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the Motion is not well-taken and will be denied.

## BACKGROUND

Plaintiff Stephen Slevin commenced the instant action on December 28, 2008.   *See* Doc. 1 (Complaint).   Plaintiff had been arrested on state charges of driving while intoxicated and receiving or transferring a stolen vehicle, and was booked into the Doña Ana County Detention Center (the "Detention Center") on August 24, 2005.   *Id*. at 2.   He remained at the Detention Center until June 25, 2007, when the charges against him were dismissed.   *Id*. at 4.   Plaintiff alleged that, because of his mental illness, officials at the Detention Center kept him in administrative segregation for virtually the entire 22 months of his incarceration, without humane conditions of confinement or adequate medical care, and without periodic review of his confinement, causing his physical and mental deterioration.   *Id.* at 2-4.   Based on these

allegations, Plaintiff claimed that Defendants violated his procedural due process and substantive due process rights and his rights under the Americans with Disabilities Act, and committed the torts of false imprisonment and negligent maintenance of a building.   *Id.* at 4-7.

The case proceeded to a five-day jury trial.   After several hours of deliberation, the jury returned a verdict in favor of Plaintiff on all counts.   *See* Doc. 96 (Special Verdict Form). Specifically, the jury found Defendants Board of County Commissioners (the "County"), Christopher Barela, Director of the Detention Center, and Daniel Zemek, Medical Director of the Detention Center, liable for depriving Plaintiff of his constitutional rights to humane conditions of confinement, adequate medical care, and procedural due process, and as a result of these constitutional deprivations, found that Plaintiff was entitled to compensatory damages from the County, Barela, and Zemek, and to punitive damages from Barela and Zemek.   *Id.*   The jury awarded Plaintiff $3 million in punitive damages against Barela, and $3.5 million in punitive damages against Zemek.   *Id.*   The jury further found Defendant Barela liable for violating Plaintiff's rights under the Americans with Disabilities Act, and as result of this violation, found that Plaintiff was entitled to compensatory damages from Barela.   *Id.*   Next, the jury found the Detention Center liable for the torts of false imprisonment and negligent operation or maintenance of a building, and as a result of this liability, found that Plaintiff was entitled to compensatory damages from the Detention Center.   *Id.*   Finally, the jury fixed the amount of compensatory damages at $15.5 million, to include $500,000 for each month that Plaintiff was incarcerated, plus an additional $1 million for each year since Plaintiff's release from custody.   *Id.*

A Final Judgment in favor of Plaintiff was entered on February 17, 2012.   Doc. 105. Thereafter, on March 16, 2012, Defendants filed the instant motion seeking a new trial or, in the

2

alternative, remittitur.   Doc. 120.   Plaintiff filed a response in opposition on April 6, 2012, Doc.

128, and Defendants' reply followed on April 23, 2012.   Doc. 134.

## LEGAL STANDARD

This Court's "review of a jury's findings with respect to damages is limited to whether they

are supported by substantial evidence."   *Evans v. Fogerty*, 241 F. App'x 542, 561, 2007 WL

2380990 (10th Cir. 2007), *cert. denied*, 553 U.S. 1018 (2008).   In reviewing a damages award for

excessiveness, the Court is guided by the principle that "[i]t is within the virtually exclusive

purview of the jury to evaluate credibility and fix damages."   *United Int'l Holdings, Inc. v. Wharf

(Holdings) Ltd.*, 210 F.3d 1207, 1230 (10th Cir. 2000), *aff'd*, 532 U.S. 588 (2001); *State Office

Sys., Inc. v. Olivetti Corp. of America*, 762 F.2d 843, 847 (10th Cir. 1985) (noting that "[t]he fixing

of damages is peculiarly a function of the jury") (citation omitted); *see also Malandris v. Merrill

Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1170 (10th Cir. 1981) (*en banc*) ("What is

most relevant in this case is not the judicial conscience, it is the conscience of the community as

represented by the six people who served on this trial jury.").   Accordingly, the Tenth Circuit has

made clear that, unless the jury has awarded damages "so excessive as to shock the judicial

conscience and to raise an irresistible inference that passion, prejudice, corruption or other

improper cause invaded the trial, the jury's determination of the damages is considered inviolate."

*Id.* at 1168.   While "bias, prejudice or passion can be inferred from excessiveness[,] . . . a verdict

will not be set aside on this basis unless it is so plainly excessive as to suggest that it was the

product of such passion or prejudice on the part of the jury."   *Id.*   Upon a finding that a damages

award is erroneously excessive, under the practice of remittitur, the Court "may condition a denial

of a motion for a new trial on the plaintiff's accepting damages in a reduced amount."   *McClary v.

Coughlin, III*, 87 F. Supp. 2d 205, 218 (W.D.N.Y. 2000), *aff'd*, 237 F.3d 185 (2d Cir. 2001).

**DISCUSSION**

I.    <u>Compensatory Damages Award</u>

Defendants ask this Court to grant a new trial on damages, or in the alternative, condition denial of a new trial on Plaintiff's acceptance of a reduction in his compensatory damages award from $15.5 million to $2 million.   Although admitting both that the jury's finding of liability was proper, and that there was "substantial evidence supporting an award of compensatory damages," Doc. 121 at 2, Defendants nonetheless argue that the compensatory damages award fixed by the jury is "'plainly excessive' and likely the product of passion and prejudice."   *Id.* at 3.   According to Defendants, although the "evidence and injury [suffered by Plaintiff] are not to be minimized . . . no reasonable calculus can value Plaintiff's compensatory damages at $6 million per year of incarceration, as the jury did."   *Id.*   As set forth herein, under the "relatively generous" standard applicable to this Court's review of the damages award, and carefully considering the facts of this case, *see Evans*, 241 F. App'x at 562, the Court cannot agree with Defendants that the jury's compensatory damages award shocks the judicial conscience.

A.    <u>The Jury's Compensatory Award is Not Excessive on Its Face.</u>

Defendants argue that the sheer amount of the award demonstrates its excessiveness, and that on this basis alone, the award should be remitted.   In support of this argument, Defendants first note that at least $15 million of the award is attributable solely to "intangibles," namely, pain, suffering, and emotional distress.   Without providing any explanation or legal authority for their position, Defendants appear to be arguing that $15 million is an unreasonably high award for non-economic, non-medical losses.

But case law makes clear that it is precisely in this situation – where the jury has been asked to place a monetary value on Plaintiff's experience of non-economic harm – that deference to the

jury's determination is most appropriate.   *See Eich v. Board of Regents for Cent. Missouri State Univ.*, 350 F.3d 752, 763 (8th Cir. 2004) ("[A]wards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms.").   Indeed, where the jury has fixed an award to compensate a plaintiff for pain and suffering, the court is permitted to grant a new trial or remit the judgment "only rarely and in extraordinary circumstances."   *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 80 (1st Cir. 2010).   This is especially true where, as here, the jury found that the conditions of Plaintiff's confinement violated his constitutional rights.   *Evans*, 241 F. App'x at 562 (stating that, in cases involving constitutional rights, compensation "should not be approached in a miserly fashion.   It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right") (citation omitted). As the First Circuit has explained, "dollars are at best a rough and awkward proxy for time spent in the throes of wrongful incarceration.   In the final analysis, it is for the trier of fact to resolve the difficult questions of quantification and monetization that lurk in the penumbra of cases such as this."   *Limone v. United States*, 579 F.3d 79, 105 (1st Cir. 2009).   Defendants have failed to demonstrate that any rare or extraordinary circumstances exist to warrant the Court's substitution of its own judgment for that of the jury on the difficult question of quantifying Plaintiff's pain, suffering, and emotional loss.

In further support of their argument that the jury's award is "facially excessive," Defendants point to the request made by Plaintiff's counsel, in closing, for a compensatory damages award of $6 million.   According to Defendants, because the jury awarded "more than two and one-half times" the amount that Plaintiff's counsel described as "fair compensation" for Plaintiff's injuries, the award must be excessive.   Doc. 121 at 3.   As an initial matter, Defendants

have pointed to no authority for the proposition that an attorney's argument as to what might constitute "fair compensation" is a basis for rejecting the award that the jury ultimately fixes. Indeed, to the contrary, the jury's refusal to blindly agree with what it heard in argument suggests that it instead properly followed the Court's instruction to make an independent determination as to what damages were fair in light of the evidence.   Further, as Defendants themselves admit, Plaintiff's counsel did not limit his request to $6 million, but instead "was careful to leave room for the jury to make a higher assessment."   Doc. 121 at 3.   While initially stating that $6 million would be fair compensation, Plaintiff's counsel later changed his mind, stating, "Actually, it's not. I don't know why I said that.   It's not fair compensation, we can't give it to him."   Doc. 116 at 160 (Tr. 1/23/12).   Accordingly, assuming *arguendo* that it would be proper for the Court to consider closing arguments in analyzing the propriety of the damages award, the statements made during Plaintiff's closing provide no basis for the Court to find that "fair compensation" is limited to $6 million.

Defendants next ask the Court to find the damages award excessive based on a comparison with other cases "comparable to the present case in various respects and therefore informative about community and judicial attitudes regarding fair compensation."   Doc. 121 at 3-4.   It is well-settled, however, that "a jury's damages award is highly specific to the facts and circumstances of the case."   *Evans*, 241 F. App'x at 562.   Although the Court's determination may be "informed by a review of awards granted in other comparable cases, . . . comparisons with other cases are not dispositive," and indeed, need not be referenced in analyzing the propriety of a damages award.   *McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 723 7232011 WL 1350453 (10th Cir. 2011) (citations omitted).   Rather, "the relevant inquiry is whether the compensatory award was excessive in relation to the injury."   *Malandris*, 703 F.2d at 1169.

6

The Court is "not persuaded by [Defendants'] comparisons to other jury awards."

*McInerney*, 463 F. App'x at 723.   First, in several of the cases cited by Defendants, the court

actually *upheld* the damages award set by the jury.   *See, e.g., Limone*, 579 F.3d at 106-07 (finding

that awards fell short of shocking the conscience); *Drumgold v. Callahan*, 806 F. Supp. 2d 405,

427 (D. Mass. 2011) ("defer[ring] to the jury's finding on the monetary value of the harm that

Drumgold suffered for fourteen years in prison"); *Smith v. Rowe*, 761 F.2d 360, 368 (7th Cir.

1985) (finding jury verdict supported by record, and noting that "[d]amages assessed by a jury are

largely discretionary with it").   These cases provide no authority for reversing the jury's damages

award.   Indeed, the propriety of a damages award in the amount at issue here was simply not

before the court in any of these cases.   They thus have no precedential value as to the sole issue

before this Court, namely, whether the jury's determination of damages, based on the specific

evidence before it, shocks the judicial conscience.

Moreover, several cases upon which Defendants rely did not involve motions to remit a

jury award, but rather involved the district court, in the first instance, calculating compensatory

damages.   *See, e.g., Ford v. Bender*, No. 07-11457, 2012 WL 262532, *16 (D. Mass. Jan. 27,

2012); *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 308-09 (S.D.N.Y 2001); *Nettles v.

Griffith*, 883 F. Supp. 136, 145-46 (E.D. Tex. 1995).   This is a significant distinction.   While a

court has the benefit of legal precedent in fashioning what it finds to be a fair damages award, a

jury is afforded no such comparative information, or any other guideposts, in valuing a plaintiff's

losses.   Indeed, the jury here was specifically instructed that "[n]o evidence of the value of

intangible things, such as mental or physical pain and suffering, has been or need be introduced,

and that there is "no exact standard for fixing the compensation to be awarded" for intangible

things such as mental or physical pain and suffering.   Doc. 93 at 32 (Instruction No. 24).   Rather,

the Court instructed the jury to be "guided by dispassionate common sense," to use "sound discretion," and to make an award that is "fair in light of the evidence." *Id*. at 31-32.   After thus relegating the damages determination to the jury's "sound discretion", it would be hypocritical for the Court now to find the jury's damages award excessive, based on a purported standard of "judicial attitudes regarding fair compensation" articulated in court decisions of which the jury was unaware.   The Court declines to hold the jury responsible for deviating from a "norm", when the jury was not made privy to any such norm, and indeed, was instructed that no such norm exists.

Finally, the Court finds unpersuasive the remaining case cited by Defendants, *McClary v. Coughlin*, *supra*.   In that 12 year-old case, the court had required the plaintiff, before trial, to submit an itemization of damages claimed.   The court relied in part on this itemization, and in part on its review of "the range of damages previously awarded to inmates who suffered unlawful SHU confinement," in finding the jury award to be excessive.   87 F. Supp. 2d at 218.   In contrast, here, there was no itemization required of, or provided by, Plaintiff.   Further, as noted above, this Court declines to consider, as did the *McClary* court, the amount of damages awarded in other "similar" cases in determining the propriety of the jury's damages award.

Instead, following the Tenth Circuit's directive, this Court inquires as to "whether the compensatory award was excessive in relation to the injury."   *Malandris*, 703 F.2d at 1169. Having presided over the trial, heard the testimony, received the exhibits, and observed the demeanor of the witnesses, the Court cannot find that the award was excessive in relation to the injury.

Without recounting the entirety of the evidence presented at trial, the Court notes that the jury saw and heard evidence of Plaintiff's physical, emotional, and mental suffering as a result of his confinement in administrative segregation.   That evidence included letters written by Plaintiff

8

seeking help, and sick call requests documenting Plaintiff's suffering from bed sores on his thighs, fungus growing on his face, rotting teeth, pain, inability to sleep and nightmares when he could sleep.   *See* Exs. 4-6.   In a letter written in November 2005, he described "at least 4 or 5 anxiety attacks a day," and said, "I don't know how much longer I can go on like this." Ex. 4.   Later in 2005, he described conditions as going "from bad to worst."   *Id.*   His letters show the deterioration in his ability to write.   Medical records kept by the Detention Center similarly documented Plaintiff's experience of pain and suffering, and the lack of treatment for his many medical and dental conditions.   Further, the Detention Center's "recreation log" revealed that Plaintiff was allowed out of his cell for virtually no time in May or June 2006, no time out at all in July, only three days in August, two days in September, and two days in October 2006.   Although Plaintiff remained incarcerated for six months after October 2006, the Detention Center's records showed no recreation at all for him after that date.   Plaintiff thus spent six months alone in his cell with virtually no human contact before his release.

Although first attempting to explain away this lack of recreation time by testifying that Plaintiff refused to come out of his cell, Barela testified that he would not have put his dog in a cell like Plaintiff's cell and left him there for a month at a time, even if his dog refused to come out. He admitted that, if his dog refused to come out, he would wonder what was wrong with her and take her to the veterinarian.   Barela also acknowledged that he knew it was not acceptable to leave his dog or Plaintiff in the conditions in which Plaintiff was left, and that Plaintiff's conditions of confinement were not in accord with the standards of the Detention Center.   Doc. 109 at 196-99 (Tr. 1/18/12).

With regard to the injurious effects of administrative confinement on Plaintiff, his expert, Dr. Grassian, testified that although there was "pretty clear evidence that Mr. Slevin was quite a

competent individual prior to his incarceration," the conditions of his confinement left him

"broken," with "massively severe" PTSD, to the extent that it was questionable whether he could

have been found competent to stand trial by October of 2006.   Doc. 115 at 41, 51, 74 (Tr.

1/20/12).   Dr. Grassian described Plaintiff's PTSD as "horribly symptomatic, with intrusive

thoughts, the anxiety, the startle response, the fearfulness, the decreased self-esteem, and social

isolation," and testified that Plaintiff was "more massively impaired by the PTSD, post-traumatic

stress disorder, than [he] ha[d] ever seen in [his] entire professional life."   *Id.* at 74.   According to

Dr. Grassian's testimony, Plaintiff's life "is kind of torture."   *Id.* at 77.   Kim Travers and John

Richard Stevens, witnesses who knew Plaintiff before his confinement, similarly testified that

Plaintiff had become "empty"; "[n]ot a whole person"; "vacant"; "a shell of the former person that

he was"; and "[l]ike an old man that just didn't have any life left in him."   Doc. 116 at 40, 159, 64

(Tr. 1/23/12).

Considering the whole of the evidence, including Plaintiff's condition before and after the

impact of his solitary confinement, and the testimony of present and permanent mental injury to

Plaintiff, the Court is satisfied that the jury's "compensatory award itself is not so plainly

excessive that [the Court] should infer that it was the product of passion or prejudice or hold that it

is so shocking to the conscience of the court."   *Malandris*, 703 F.2d at 1170-71.   Rather, the

jury's "award was justified by the evidence and cannot be said by reason of its amount to

demonstrate bias or passion on the part of the jury in arriving at its verdict."   *Barnes v. Smith*, 305

F.2d 226, 230 (10th Cir. 1962).

B.     The Circumstances of the Trial Did Not Bias the Jury.

Defendants argue that the compensatory award should be remitted for the additional reason

that the specific circumstances of the trial caused "the flames of passion to enter into the jury's

10

consideration." Doc. 121 at 6. In support of this argument, Defendants insist that the nature of this case, namely the "glaringly deficient" treatment accorded jail detainees, in addition to the testimony of John Oates "describing the sounds, smells, and experiences of life as a detainee" and the Court's statements following that testimony, are by their very nature inflammatory. *Id.* at 6-7. Defendants further insist that the jury's use of a "per diem" method of determining damages, coupled with the jury's communications to the Court, demonstrate that the jury, in awarding damages, indeed must have succumbed to the influence of passion and prejudice. The Court disagrees.

As an initial matter, Defendants' argument ignores the fact that the Court's instructions to the jury – to which neither party raised any objections – specifically directed the jurors: *not* to allow "personal likes or dislikes, opinions, prejudices, or sympathy" to affect their decision-making; *not* to infer from the instructions, or from anything the Court said or did, as indicating that the Court has "an opinion regarding the evidence or what [the] verdict should be"; and *not* to impose compensatory damages as a punishment, or to increase such damages for the purpose of penalizing a defendant. *See* Doc. 93 at 1, 31 (Instruction Nos. 1, 24). There is a well-established presumption that jurors follow their instructions. *Sanchez v. Brokop*, 398 F. Supp. 2d 1177, 1182 (D.N.M. 2005). Indeed, as the Supreme Court has explained:

> The jury system is premised on the idea that rationality and careful regard for the court's instructions will confine and exclude jurors' raw emotions. Jurors routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death matters. In those cases, as in all cases, juries are presumed to follow the court's instructions.

*CSX Transp., Inc. v. Thurston Hensley*, 556 U.S. 838, 841 (2009). Defendants have presented no compelling evidence to rebut this presumption, and thus no reason for the Court to find that the jury abdicated its responsibilities. Accordingly, the Court finds that the jury followed its

11

instructions to "decide the case solely on the evidence before [it]," "consider only the testimony and exhibits received into evidence," and award Plaintiff compensatory damages in an amount "that [] fairly compensate[d] Plaintiff . . . for "[a]ny bodily injury that Plaintiff sustained and any pain and suffering, emotional distress, personal humiliation, disability, disfigurement, mental anguish, and/or loss of capacity for enjoyment of life that Plaintiff experienced in the past or is reasonably likely to experience in the future." *Id.* at 1, 24, 32 (Instruction Nos. 1, 17, 24).

Further, in arguing that the jury's compensatory award cannot possibly have been based on the evidence because that evidence "vividly portray[ed] Plaintiff's degeneration into a disheveled, unkempt, withdrawn, and haunted individual during his period of incarceration," Defendants misunderstand the responsibility of a jury in a case where, as here, the disturbing nature of the evidence is beyond dispute.   Doc. 121 at 6.   As the Tenth Circuit has stated, "[i]t is not the duty of jurors to set aside, even if it were possible, all the decencies of human emotion when called upon to decide controversy."   *Barnes*, 305 F.2d at 229.   Rather, "[i]t is the duty of jurors not to allow emotion to overcome fact, not to allow sympathy to overcome reason, not to allow desire for result to overcome justice."   *Id.*   Although like *Barnes*, this case is "one where complete detachment would be unnatural and natural pity could dominate the course of the trial," *id.*, the evidence properly presented at trial provided a solid, factual foundation more than sufficient to support the jury's award.   The Court thus cannot find, as Defendants urge, that the jury's award was based on emotion, sympathy, or desire for result, rather than fact, reason, and justice.   To the contrary, as in *Barnes*, the Court finds "that the verdict was the result of conscientious deliberation and the admirable performance of duty."   *Id.*

Also unpersuasive is Defendants' argument that the Court's own statements at the conclusion of Mr. Oates' testimony "could only have suggested to the jury that Plaintiff, too, was

owed an apology by society in the form of substantial damages."   Doc. 121 at 7.   After Mr. Oates

testified about the effects of having been kept in a holding cell the previous day, the Court stated:

> Thank you very much, Mr. Oates.   And I'm sorry about yesterday, but I
> thank you very much for coming today and answering all of our questions.
>
> And I want to thank the officers very much for making another trip today.
> Sorry for the inconvenience yesterday.   But thank you very much for driving Mr.
> Oates today.   All right.
>
> Mr. Oates, best to you.

Doc. 111 at 96-97 (Tr. 1/19/12).   To describe as a stretch Defendants' reading of these statements

to be a "judicial endorsement of Plaintiff's claim" would be overly generous.   Doc. 121 at 7.

Indeed, read in context, it is clear that the Court expressed to the transporting officers – just as

much a "proxy" for the Detention Center as was Mr. Oates for Plaintiff – the same gratitude and

apology it expressed to Mr. Oates himself.   The bias in the Court's statements is nonexistent.

Finally, neither the jury's use of a "per diem" method to calculate damages, nor the

questions asked by the jury during deliberations, prove Defendants' theory that the jury must have

been motivated by prejudice or passion.   First, as Defendants admit, using a "per diem" method to

determine damages is entirely proper.   Doc. 121 at 8.   Defendants fail to explain why the jury's

use of this method should be interpreted as a manifestation of its bias, rather than as a legitimate

attempt by the jury to rationally "resolve the difficult questions of quantification and

monetization" which it was called upon to accomplish.   *Limone*, 579 F.3d at 105.

Next, a plain reading of the jury's notes dispels any notion that the jury's inquiries reflected

an improper desire to punish the County through the compensatory award.   During its

deliberations, the jury sent four notes to the Court seeking clarification of its instructions.   Two of

the jury's notes involved damages.   The first jury note inquired as to who would be "responsible

for compensatory damages – Defendants? Or County?", and then asked, "Punitive falls to Zemek

& Barela – right?"   Doc. 94 at 2.   The jury thus was requesting clarification as to who is

responsible for each type of damages, compensatory and punitive.   By so inquiring, the jury

displayed no inclination to impose either category of damages on any party to whom such damages

would not properly be imposed.   The more likely conclusion is that the jury sent the note to ensure

that it imposed only the proper category of damages on each party.

   The fourth jury note asked for clarification as to the punitive damages instruction.

Specifically, because that instruction states that the financial resources of Defendant is a proper

factor for consideration in setting a punitive damages award, the jury asked whether it could or

would be provided such information, "i.e. if we want to award punitive damages above any

insurance policy limits to make sure it is personally felt by defendants."   *Id.* at 7.   The wording of

this note makes clear that the jury was considering punishment solely in the context of punitive

damages.   This, obviously, is entirely proper.   Indeed, the Court specifically instructed the jury

that the purpose of punitive damages is "to punish Defendant and to deter Defendant and others

from committing similar acts in the future," and accordingly, that in awarding punitive damages,

the jury may consider "the degree of reprehensibility of Defendant's conduct, the relationship of

any award of punitive damages to any actual injury inflicted on Plaintiff, and the financial

resources of Defendant."   Doc. 93 at 34-35 (Instruction No. 26).   The same instruction makes

clear that the jury could only consider punitive damages against Defendants Barela and Zemek.

*Id.* at 34.   Given the language of the note, coupled with the language of the instruction for which

the jury sought clarification, it would be nonsensical to interpret the jury's inquiry as evincing an

attempt to punish the County, rather than the individual Defendants.

   Accordingly, there is no basis to conclude, from the jury's calculation of the damages

award, their notes to the court, or otherwise, that any of the circumstances at trial, including the

14

nature of the case, the testimony of Mr. Oates, or the Court's own statements, caused the jury to allow "the flames of passion" to enter into its consideration of the compensatory damages awarded to Plaintiff.

II.    Punitive Damages Award

Defendants ask the Court to "presume" that the punitive damages awarded by the jury against Barela and Zemek were "driven to excessive levels by the jury's unchecked emotions." Doc. 121 at 10.   In support of this request, Defendants cite no legal authority, and state only that "the compensatory award was colored by jury passion and prejudice," and that "nothing indicates that the punitive awards were not similarly affected."   *Id.*

"It is well established that there are procedural and substantive constitutional limitations on punitive damage awards, and that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."   *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1121 (10th Cir. 2004) (citations omitted).   In analyzing the constitutionality of punitive damages, the Court considers: "1) the degree of reprehensibility of the defendant's actions; 2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases."   *Id.*   In addition to a constitutional challenge to a punitive damages award, a defendant also may make a common law challenge on the basis that "the award is so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial."   *Id.* (citation omitted).   On a common law challenge, however, "even where a persuasive explanation of the jury's damages award indicates an award contrary to law, the

possibility of a proper explanation, however slight the chance, will suffice to sustain the damages award."   *Id.* at 1123 (citation omitted).

Here, Defendants have failed to raise any constitutional challenge to the punitive damages awarded by the jury.   Accordingly, Defendants' excessiveness claim is a common law one, and not a constitutional one.   That claim must fail, as Defendants have not provided *any* persuasive explanation of the jury's damages award that indicates an award contrary to law.   Further, "[t]here is more than a mere possibility that the punitive damage awards in this case were properly intended to punish what has occurred and to deter its repetition."   *Id.* (citation omitted).

As noted above, the only "explanation" of the jury's damages award provided by Defendants is that, because the compensatory damages award was colored by passion and prejudice, the punitive damages award also must have been so improperly colored.   As discussed in detail above, the Court disagrees with the underlying premise that the compensatory damages award was improper.   Accordingly, Defendants' argument that the punitive damages award is contrary to law for the simple reason that it must have been "similarly affected" is equally unavailing.

Beyond this argument by extension, Defendants provide no evidence to rebut the presumption that the jury followed the Court's instructions with regard to punitive damages.   *See CSX Transp., Inc.*, 556 U.S. at 841.   In its instructions, the Court:   cautioned that punitive damages would be appropriate only if the jury found "that Defendant's conduct was malicious, willful or with callous or reckless indifference to the safety or rights of others;" instructed the jury to "use reason in setting the amount" of punitive damages; and prohibited the jury from imposing a punitive damage award that "reflect[s] bias, prejudice or sympathy toward any party."   Doc. 93 at

34-35 (Instruction No. 26).   The Court finds that the jury followed each of these instructions in calculating its punitive damages awards.

Further, there is "more than a mere possibility" that the jury, by awarding punitive damages against Barela in the amount of $3.5 million and against Zemek in the amount of $3 million, properly intended to punish each for what has occurred.   The evidence presented at trial to prove deliberate indifference, an essential element of the constitutional claims against Barela and Zemek, was equally sufficient to prove the "callous or reckless indifference" necessary to award punitive damages.   Such evidence included the testimony of Barela and Zemek themselves, each of whom admitted that he failed to provide the appropriate level of physical and mental care to Plaintiff.   Considering the whole of the evidence, including the admissions of Barela and Zemek, the Court cannot find that "the punitive award was so excessive that it shocks the judicial conscience or leads to an inescapable inference that it resulted from improper passion or prejudice on the part of the jury." *Malandris*, 703 F.2d at 1177.

Finally, the Court notes that this is not a case where the ratio of punitive to compensatory damages is excessively high.   In fact, the punitive damages award represents a fraction of the compensatory award, rather than a multiplier of it.   For all of these reasons, the Court declines to accept Defendants' invitation to presume that the punitive damages award is excessive.

## CONCLUSION

The Court finds that the jury's compensatory damages award was justified by the evidence and cannot be said by reason of its amount to demonstrate bias or passion on the part of the jury in arriving at its verdict.   The Court further finds that none of the circumstances at trial caused the jury to allow "the flames of passion" to enter into its consideration of the compensatory damages awarded to Plaintiff.   Finally, the Court finds that the jury's punitive damages awards are not so

17

excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial.

**IT IS THEREFORE ORDERED** that Defendants' Motion for New Trial on Damages or, in the Alternative, Remittitur [Doc. 120], is **DENIED**.

DATED this 14th day of December, 2012.

_____

MARTHA VÁZQUEZ
United States District Judge